LOVINA B. GRAND, ADMINISTRATRIX, ETC., V. THE
MICHIGAN CENTRAL RAILROAD COMPANY.

*Railroad companies—Negligence—Injury to brakeman—Split
switches—Contributory negligence.*

1. In this case it is held that plaintiff's intestate was guilty of con-
tributory negligence in undertaking to uncouple defendant's cars
while in motion, and while passing over a "split switch" in
use on its road, and which, as he must have known, could not
be blocked at the place where his foot was caught.

2. Whether Act No. 174, Laws of 1883, p. 191 (3 How. Stat. § 3397a),
requiring railroad companies so to adjust, fill, or block the
frogs, switches, and guard-rails on their roads as to prevent the
feet of employés from being caught therein, applies to "split
switches," so called, which were not in use at the time of the
passage of said act, *query.*

3. The failure of a railroad company to comply with the provisions
of said act will render it liable to an employé who is thereby
injured, in a case where the law applies, if he is not himself
guilty of negligence.

Error to Jackson.    (Peck, J.)    Argued May 9, 1890.
Decided December 24, 1890.

Negligence case.    Plaintiff brings error.    Affirmed.    The
facts are stated in the opinion.

*Loud & Price,* for appellant.

*Gibson & Parkinson,* for defendant.

CHAMPLIN, C. J.    This is an action on the case for
negligently killing a brakeman who was in the employ-
ment of the defendant.

The declaration contains three counts.    The first count
sets forth the employment of Allen J. Shivelle as a
brakeman on one of defendant's freight trains; that

Albion is a station on defendant's road, where trains are made up, and containing a yard for that purpose; that plaintiff, with other employés of defendant, were engaged in making up a train, and attaching cars together, and, in such employment it became and was the duty of Shivelle—

"To fasten and couple a certain car, then standing upon the track occupied and used by the defendant, with and to certain other cars, which were then being moved and pushed by such locomotive engine towards and against the car so to be coupled and attached to them; and the plaintiff avers that, in order to couple such cars together, it became and was necessary for said Shivelle to step over and inside the rails of said track upon which said cars were, and over a certain frog or switch denominated a 'split switch,' and there remain until the said cars were forced so close together that they could be coupled and attached by means of the apparatus for that purpose provided; and that, if said switch or frog had been properly constructed, or had been properly blocked, as it was the duty of said defendant to have done, it would have been entirely practicable and safe for said Shivelle to have stepped over said rails, and remained between said cars and the rails of said railroad track, while engaged in coupling said cars. But the said plaintiff avers that said railroad track and switch were not properly constructed, and said switch was not blocked, nor stopped up, so that the feet of employés and others could not enter, but was improperly constructed for the purpose of coupling said cars, to such an extent as to render it highly dangerous to said Shivelle to couple such cars in the ordinary and usual method hereinbefore stated, of which dangerous and improper construction and defects, and unsafe condition, of said railroad tracks and switch or frog, the said defendant was then and there well knowing, and of which dangerous and unsafe condition the said Shivelle was ignorant.

"And said plaintiff avers that the said Shivelle, not having been informed or knowing of the dangerous and unsafe condition and improper construction of said tracks and switch or frog, or the danger incurred in coupling said cars at that place, did then and there attempt to

couple and attach together such cars upon such defective and dangerous track, as said cars were being pushed and driven together by means of said locomotive engine. Yet the defendant, well knowing the premises, and that it was its duty to block all such switches and frogs, while it was so the occupier of said railroad, while there was such defective, unsafe, and dangerous track as aforesaid, to wit, on the day and year aforesaid, at Albion, aforesaid, negligently, wrongfully, and unjustly permitted the track and switch to be and continue in such defective, improper, unsafe, and dangerous condition; that by means of the premises, and for want of proper apparatus, and for want of blocking in said switch or frog, the said Shivelle, while then and there engaged in the act of coupling together said cars upon said track, with all due care and diligence, was necessarily and unavoidably caught by his foot in said switch or frog, and between said cars, and was then and there killed."

The second count sets forth that Shivelle was engaged in coupling two cars together, and that defendant neglected so to adjust, fill, or block all frogs, switches, and guard-rails on its road as to prevent the feet of its employés, and other persons, from being caught therein.

The third count, which was permitted to be added upon the trial, avers that it was the duty of defendant so to adjust, fill, or block all frogs, switches, and guard-rails on its road, and in said yard, as to prevent the feet of its employés, or other persons, from being caught therein. And the plaintiff avers that the defendant wholly neglected this duty, and negligently, wrongfully, and unjustly permitted a certain switch, known as "the split switch," in said yard, to be and remain unblocked and unfilled. It then avers that Shivelle, while in the exercise of due care, and in the act of uncoupling cars, was caught by the foot, and killed by the train passing over his body. And the plaintiff averred that the said Shivelle came to his death then and there by means of

the negligence and carelessness of the defendant in adopting and using, and in permitting to be used, such dangerous switches upon its railroad. The last count is the only one which sets up the injury as having occurred by uncoupling cars.

The testimony for plaintiff showed that Shivelle had been in the employ of defendant for seven years, and, during the last two years, as brakeman. He was 25 years of age, and was killed at about half past 6 o'clock on the evening of November 7, 1887. The train upon which he was braking started from Jackson junction to go west to Michigan City, a distance of 153 miles. When it arrived at Albion, it stopped to do some switching. Cars were to be left, and some taken on, at that place. The brakeman doing the switching has command of the train for the time being. The engineer is under his control, and he conducts its movements through appropriate signs from the brakeman. At the time of the accident, Shivelle was the brakeman doing the work, and he had control of the train, which was cut in two, leaving the way car upon the main track. He had thrown one car upon the side track, and there was another to be left, which was between two cars in that portion of the train attached to the engine, and which had passed the switch to the west, and lay on the main track. Shivelle threw the switch so as to permit the train to back east on the main track. The switch lever was on the south side. By throwing the switch for the main track, the south arm of the switch was brought in close contact with the main rail on that side, and the north arm was brought away from the north main rail, about four or five inches at the extreme end, leaving the switch open upon that side. The ballasting came flush

with the top of the ties, presenting a smooth level surface between the rails.

The switches used upon the main line of the Michigan Central Railroad are what are designated as "split switches," and had been in use by defendant since the year 1883. In the construction of this switch a "frog" is not used. The movable rails of the switch are both between the stationary rails of the road, which, at the point of contact with the switch, are not parallel to each other. The one diverging forms a permanent and immovable rail of the switch track. The ends of the switch rails are planed on the inside, from a point about seven feet back, so as to form an acute angle at the point on the outside of the rail. In the use of this switch, one side is always open, and the other closed; that is, by closing one side the other is opened. Back of the planed portion, when the switch is open, the rail of the switch, and that of the main track, are nearly parallel and about two inches apart for a distance of about seven feet, when they diverge, gradually leaving a wedge-shaped opening between the rails. On the side of the switch which is closed, back of the planed portion, there is a wedge-shape opening between the rails. But neither of these openings occasioned the injury to the brakeman Shivelle. By the use of these switches, the chance for accident is lessened one-half, through carelessness in leaving the switch open, as a train proceeding in the direction that the switch enters the main track will not be derailed. Its use is much safer for the traveling public, and for trains running at a high rate of speed, but is more dangerous for employés, than the frog switch properly blocked, inasmuch as it cannot be blocked without destroying its efficiency, as will be seen by the following cut:

After throwing the switch for the main track, Shivelle crossed to the north side of the main track, and signaled the engineer to back his train. He was not seen afterwards alive. But it is inferred that he stepped between the cars, while in motion, to pull the coupling pin, as the shoe of his right foot was found in the open switch about a foot back from the point, and he lying upon the ground close to the outside of the north rail, with his head to the east, his feet about a foot east of the point of the switch. The wheels of the car had passed over his right leg below the knee, and then along the right side of his body. His left hand rested upon his lantern, the light of which was extinguished. The engineer saw his light go down, and, receiving no further signal, inquired where he was, and he was found as above. Life was extinct.

When Shivelle went into the employment of defendant, he was furnished with the rules of the company, to which all employés were required to give their consent and conform to. Among the rules and requirements were the following:

"SWITCHES AND FROGS.

"Attention is also called to the necessity of equal care in working about switches at stations, and in yards, to avoid injury by having feet caught in frogs, switches, and guard-rails.

"JUMPING ON AND OFF.

"Jumping on and off cars or engines in motion, entering between cars in motion to couple or uncouple them, and all similar imprudences, are forbidden.

"EXERCISE CAUTION.

"Every employé is required to exercise the utmost caution to avoid injury to himself or fellow-employés, especially in coupling, switching, or other movements of cars and trains."

On September 18, 1885, Shivelle signed a written acknowledgment that he had been informed of the duties connected with his employment, and which he was about to undertake, namely, that of brakeman and switchman, and that the performance of said duties will expose him to great danger, the risk of which he assumed, and that he must use proper and constant care to avoid injury to himself and others. He acknowledged that he had been furnished with a coupling stick, and a copy of the printed rules of the company, with which he was to familiarize himself, and be governed accordingly. He also acknowledged that he had read rule 29, above quoted. Shivelle was well aware of the character of the switches in use upon the tracks of the defendant company, and of the dangerous character to employés of the "split switch," so called. Its danger was open and apparent to all persons occupying the position which he did upon the road. He must have known, for it was apparent, that such a switch could not be blocked at the place where his foot was caught. He entered into the employment of the company, and continued in its service, with full knowledge of the danger to which he was subjected by his employment. He disregarded the positive rules of the

company adopted for the purpose of protecting him from the danger of uncoupling cars in motion. The danger to life and limb was greatly increased by entering between cars in motion to uncouple them. Besides, in this case, the danger was greatly enhanced to a person who should enter between cars in motion while they were passing over a split switch. No prudent man would undertake to do such a thing. It was not necessary to do so upon this occasion. It was a violation of the rules of the company. Clearly and unmistakably, upon the undisputed facts, he was guilty of contributory negligence in undertaking to uncouple the cars while in motion, and while passing over the switch. *Gardner v. Railroad Co.*, 58 Mich. 584; *Cook v. Johnston*, Id. 437; *Lyon v. Railroad Co.*, 31 Id. 429; *Goulin v. Bridge Co.*, 64 Id. 190; *Brewer v. Railway Co.*, 56 Id. 620; *Illick v. Railroad Co.*, 67 Id. 632.

In this view of the case, the fact that defendant had not complied with the law which requires that all railroad companies shall so adjust, fill, or block the frogs, switches, and guard-rails on their roads in all yards, divisional and terminal stations, and where trains are made up, as to prevent the feet of employés or other persons from being caught therein, would not render the defendant liable in this action.[1] If Shivelle had been free from negligence, this neglect to comply with the law in a case where the law applies would be such negligence on its part as to render it liable. It would stand on the same footing as neglect to ring the bell or blow the whistle, as required by law, and we have uniformly held such negligence would not excuse the party injured from exercising ordinary care and prudence, although the defendant was negligent in not complying with the statutory requirement. *Mynning v. Railroad Co.*, 64 Mich. 93; *Matta v.*

[1] See Act No. 175, § 22, Laws of 1883.

*Railway Co.*, 69 Id. 109; *Kwiotkowski v. Railway Co.*, 70 Id. 549.

It is claimed that the statute does not apply to the switches used upon this road, for the reason that they cannot be blocked without destroying their use. The question is not one that it is necessary to decide in this case. To hold that no switches can be used, except such as can be blocked, would prevent railroad companies from adopting devices, which, it is proved, add greatly to the safety of the traveling public, although not so safe for employés. As a matter of expediency, looking to the public good and public safety, embracing within its protection the larger portion of the community, is it not reasonable to suppose that the language of the statute was aimed at a class of switches which were susceptible of being blocked without destroying their use? The switches which had long been in common use at the time this act was passed were such as could be blocked without detriment. Such switches are still in use upon the sidetracks of defendant's roads, and were in use at Albion, and the testimony is that they were all properly blocked, as the law requires. But, as before stated, we reserve our opinion as to whether split switches in use on the main track of defendant's road are subject to the law in question, as it is not necessary to decide it in this action.

The court below directed a verdict for defendant, and in this I think he was right, and the judgment should be affirmed.

CAHILL, LONG, and GRANT, JJ., concurred with CHAMPLIN, C. J.

MORSE, J., (*dissenting*). The negligence of the defendant in this case is clearly apparent. It grows out of the positive disobedience of a statute of this State, enacted

for the express purpose, and in obedience to the popular will, to save the life and limb of brakemen in this State.

It was held in *McGinnis v. Bridge Co.*, 49 Mich. 466, that a brakeman could not recover for an injury received from his foot being caught in a "frog" of the switch then in common use upon railroads in this State, for the reason that he knew of the danger of the same, and that it must be considered one of the ordinary risks of his employment; and that railroads in this State were not in duty bound to block such switches. Under this and previous decisions of this Court, there seemed to be no remedy for the loss of life and limb occasioned by the frogs in switches except by legislation. A bill was passed by the Legislature in the session of 1881, providing for the blocking of switches, which was defeated by the veto or neglect of the then Governor to sign the same. The matter became one of public agitation and concern. Public feeling was aroused, and in the fall of 1882 the subject of blocking and filling switches entered into the political campaign of that year, and was a matter of frequent discussion upon the hustings and in the public press. And the Legislature chosen that year, presumably in accordance with the expressed will of the people, passed another and the following act amendatory to the general railroad law, which was approved by Gov. Begole, and has ever since been the law of this State:

"SEC. 22. All person or persons, railroad companies or corporations, owning or operating roads in this State, shall and are hereby required on or before the first day of January, 1884, to so adjust, fill, or block the frogs, switches, and guard-rails on their roads in all yards, divisional and terminal stations, and where trains are made up, as to prevent the feet of employés or other persons from being caught therein. Any railroad company or corporation which shall fail to comply with the provisions of this section shall be liable to a fine of not less than one hundred dollars, or more than one thousand dollars, and

the neglect of any such person, company, or corporation to comply with the provisions of this section shall be deemed a violation of the same." Laws of 1883, p. 191.

It is claimed by defendant's counsel that this act was passed before split switches came into general use, and was enacted in reference to switches in general use, which could be blocked or filled; and it is argued that it is not to be supposed that the Legislature intended that the law should apply to improved switches which might be adopted thereafter, and which could not be blocked or filled in compliance with the law, and that, in view of the constant changes that are taking place in the methods and machinery of operating railroads, the courts ought to construe the statute in question with reference to the state of the art at the time it was passed. But it must be remembered in the first place that the "split switch" is by no means a new and improved switch. It has been in use for many years, and is nearly, if not quite, as old as the other switches, but it was not generally used upon the railroads of this State until after the passage of the law of 1883. It is admitted that it is more dangerous to employés than the one against which it is argued the law was directed. It looks to me that the immediate use of this switch, after the enactment of this law, was an attempted evasion of it, which ought not to be countenanced. It is not to be presumed, I think, that the Legislature, in framing this act, intended to pass a law applicable only to the then present circumstances, which law could be evaded before it went into operation by the putting in of switches that could not be blocked or filled, but which were more of a death-trap than those then in general use, which had proven to be a veritable slaughter-pen. The act was not aimed at frogs alone, but in terms, reaches all "frogs, switches, and guard-rails." It is doubtless true that this split switch could not be blocked as

the ordinary frog is blocked, but there was testimony tending to show that the danger could be greatly reduced, if not removed, by filling in the hollow of the rail, and having a straight surface on the side of both rails, as the foot is caught and retained as follows:

"*Q*. (Referring to model.) What is it about the construction of the split switch here, and the formation of the rails, that makes it retain the foot when it is caught there?

"*A*. Being hollowed underneath, you slip your foot under there. Your ankle is in here, where they are not over two inches apart, and there is no possible way of your pulling your foot out. The further you go the tighter you get. There is only one way to get out,— the way you went in. The T of the rail is what retains the foot. It is wider right in there, so the sole of your shoe would go right in there."

But, whether this switch can be filled or blocked or not, the use of it is, in my opinion, an evasion and violation of the law, which cannot be excused. Much less can such evasion and violation of the statute be used to fasten, as a matter of law, contributory negligence upon every brakeman who is injured by it, on the ground that he, instead of the railroad company, takes the risk of its unlawful use. The plaintiff in this case was not obliged to take the risk that the defendant would knowingly continue to violate the law of the State, or to evade its provisions. *Coots v. Detroit*, 75 Mich. 631, 632. This law was enacted upon the urgent demand that some action should be taken by the Legislature to save life, which was frequently being taken, without remedy, under existing laws. It is not to be supposed for one moment that the Legislature contemplated any circumstances, or change of circumstances, in the use of switches, which would prevent the enforcement of the law, and, at the same time, add danger to danger and death to death. In my opinion, the statute

is broad enough and strong enough to reach all switches, and cannot be nullified by the use of a switch which cannot be filled or blocked. If a different opinion is to prevail, it would seem that, in the interest of humanity, further legislative action is imperatively needed.

Nor do I think that the plaintiff is debarred from recovery because Shivelle stepped in between the cars, while in motion, to make the switch, in violation of a printed rule of the company. There was evidence tending to show that these cars could not be uncoupled by a man of Shivelle's physical stature, unless they were moving, and it was customary, and habitually done by the employés of the defendant while the cars were in motion. In such case, the defendant company could not hold its employés responsible for a violation of this rule, so as to shield its own gross negligence in the matter of switches. *Hunn v. Railroad Co.*, 78 Mich. 513.

Under all the circumstances of this case, the plaintiff was entitled to go to the jury upon the question of her intestate's negligence.