C. D. MARTIN, Administrator of the Estate of A. F. Flanagan, Deceased, Appellant, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY.

Action for Personal Injury: SPEED OF TRAIN: VIOLATION OF ORDINANCE: NEGLIGENCE. Habitual violation of an ordinance
1 regulating the speed of trains does not relieve railway company from the imputation of negligence.

Speed of Train: WHO BENEFITED BY ORDINANCE. The benefits of
2 an ordinance regulating speed of trains may be claimed by anyone coming within its protection.

Assumption of Risk by Employe: LIABILITY OF EMPLOYER. An
3 employe, who, knowing and appreciating a danger, assumes the risk of it, absolves his employer from liability for injury, although the employer may be primarily responsible for the danger.

Assumption of Risk: NATURE OF. In the matter of "assumption
4 of risk" it is immaterial whether the risk arises from a violation of a common law duty or an obligation imposed by ordinance.

Speed of Train: OPERATING CAUSE OF INJURY. Where an employe
5 assumes the risk incident to the ordinary speed of the train, to render the railway company liable for an injury, it must be shown not only that a greater rate of speed was negligence, but that it was the operating cause of the injury.

*Appeal from Scott District Court.*—HON. JAMES W. BOLINGER, Judge.

SATURDAY, OCTOBER 25, 1902.

ACTION for damages. Judgment on directed verdict. The plaintiff appeals.—*Affirmed.*

*E. M. Sharon* and *Ely & Bush* for Appellant.

*Cook & Dodge* for appellee.

LADD, C. J.—The freight train, composed of thirteen
loaded cars, twenty-six empties, and the caboose, was
made up at Rock Island, from which place it departed
at five o'clock in the morning.    When it reached Perry
street, in Davenport, a second engine or "helper" was
attached, and together the two pulled the train west to
Farnam, where the absence of the head brakeman was
first discovered.  Evidently he had fallen from the top of
the train about fifteen or twenty feet west of Fillmore
street, in Davenport.    The circumstances warranting this
inference are.    (1) A dint in the snow between the tracks
at that place, as though a person had fallen some distance
on the hip; (2) his lantern just outside of the track; (3)
parts of his body and blood stains from that point to the
place where the head and trunk were found.    It may also
be inferred that he fell between the third and fourth cars
from the engine, for blood stains were found on the front
trucks of the fourth car, and from there on back.    The
running board of the third car was about a foot wide,
while that on the fourth car was a foot higher, and consisted
of three strips about an inch apart, and projecting over at
the end five or six inches.    The tops were frosty, but upon
examination no indications that he had slipped were dis-
covered.    The wind was blowing from the northwest, the
direction the train moved, at a velocity of five miles an
hour.    The temperature was 11½ degrees above zero; the
humidity of the atmosphere, 90 per cent.    Fillmore street
is one block west of the semaphore, two blocks west of
Marquette street.    Between these streets are five switches,
—one at the semaphore, connecting with defendant's
branch line to the southwest, and the others with tracks to
local industries.    From Perry street to Fillmore the road
was slightly undulating, but from Fillmore street to Far-
nam, a block less than 2.7 miles away, the up grade was
47½ feet to the mile.    Opinions as to the speed of the train

differ widely, but the jury might have found it anywhere between twelve and twenty-five or thirty miles per hour. All agree that it exceeded six miles an hour, the limit fixed by the ordinance of the city of Davenport. The defendant, then, was negligent in violating the ordinance, and the three grounds of the motion on which the jury were directed to return a verdict raise the questions: (1) Did such negligence occasion the injury to deceased? (2) Did deceased, by any fault on his part, contribute to his injury? And (3) had he assumed the risk of the high rate of speed at which the train was moving?·

I.   The ordinance of the city of Davenport prohibited trains from moving within the corporate limits at a speed exceeding six miles an hour. The evidence showed that

1. SPEED of train: violation of ordinance: negligence.· it was customary on defendant's line for trains such as that in question to leave for the west at a much higher speed, in order to make the grade; and, as deceased had been engaged in work as brakeman something like seven months in all, he must have known of this practice. Of course, the mere fact that defendant habitually violated the ordinance does not relieve it from the imputation of negligence. *Hamilton v. Railway Co.*, 36 Iowa, 31; *Beard v. Railway Co.*, 79 Iowa, 522; *Weber v. City of Creston*, 75 Iowa, 16; *Conners v. Railway Co.*, 74 Iowa, 383. Nor can it be said that ordinances of this character have for their sole object the protection of those having occasion to go on or across the

2. SAME: who benefited by ordinance. tracks. They are not thus limited in their terms. Their benefit may be claimed by any person coming within their protection. *Railroad Co. v. Gilbert*, 157 Ill. 354 (41 N. E. Rep. 724); *Railway Co. v. Eggmann*, 170 Ill. 538 (48 N. E. Rep. 981, 62 Am. St. Rep. 400); *Railroad Co. v. Moore*, Ind. Sup. (53 N. E. Rep. 290, 44 L. R. A. 638); *Bluedorn v. Railway Co.*, 108 Mo. 439 (18 S. W. Rep. 1103, 32 Am. St. Rep. 615.) Nevertheless the evident purpose in their

enactment is to guard against injury to those using the streets, rather than the employes of the railroad engaged in operating the trains.

In undertaking the work of brakeman with knowledge that the ordinance was ignored by the railroad company, or continuing at work without complaint after ascertaining the fact, did deceased assume the risk of the danger incident to its violation? The authorities are in sharp conflict on this proposition. Those holding that such a risk is never assumed go on the theory that, as the assumption of risk is based on an implied contract, it would be opposed to sound public policy to permit one to agree in advance to a violation of a statute or city ordinance.   In *Narramore v. Railroad Co.*, 37 C. C. A. 499 (96 Fed. Rep. 298, 48 L. R. A. 68,) the statute enjoined on railroad companies the duty of blocking switches, and Judge Taft, after reviewing the decisions, concluded that: " 'Assumption of risk' is a term of the contract of employment by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's duty shall be at the servant's risk.   In such cases the acquiescence of the servant in the conduct of the master does not defeat a right of action on the ground that the servant causes or contributes to cause the injury to himself, but the correct statement is that no right of action arises in favor of the servant at all, for, under the terms of the employment, the master violates no legal duty to the servant in failing to protect him from dangers, the risk of which he agreed expressly to assume.   The master is not, therefore, guilty of actionable negligence toward the servant.    *    *    * This makes logical that most frequent exception to the application of doctrine by which the employe who notifies his master of a defect in the machinery or place of work, and remains in the service on a promise of repair, has a right of action if the injury results from the defect while he is waiting for repair of the defect, and has reasonable

3. ASSUMPTION of risk: liability of employes.

ground to expect it  *  *  *  If, then, the doctrine of the
assumption of risk rests really upon contract, the only
question remaining is whether the courts will enforce or
recognize, as against a servant, an agreement, express or
implied, on his part, to waive the performance of a statu-
tory duty of the master, imposed for the protection of the
servant, and in the interest of the public, and enforceable
by criminal prosecution. We do not think they will. To
do so would be to nullify the object of the statute. The
only ground for passing such a statute is found in the in-
equality of terms upon which the railway company and its
servants deal in regard to the dangers of their employment.
The manifest legislative purpose was to protect the serv-
ant by positive law, because he had not previously shown
himself capable of protecting himself by contract, and it
would entirely defeat this purpose thus to permit the serv-
ant to contract the master out of the statute. It would
certainly be novel for a court to recognize as valid an
agreement between two persons that one should violate a
criminal statute, and yet, if the assumption of risk is the
term of a contract, then the application of it in the case
at bar is to do just that." This is perhaps the clearest ex-
pression of the reasons persuading some courts to hold that
in such cases the maxim, " *Volenti non fit injuria*," will
not apply. The point appears to have been touched upon
in several English cases. See *Thomas v. Quartermaine*,
18 Q. B. Div. 685; *Baddeley v. Granville*, 19 Q. B. Div.
423. In the latter, a statute required a banksman to be
present at the mouth of a pit when miners were going up
and down. During the night it was the defendant's prac-
tice to dispense with him, and of this the plaintiff was
aware. The injury was in consequence of this omission.
The court held that plaintiff could recover; Wills, J., say-
ing: "There ought to be no encouragement given to the
making of an agreement between A and B that B shall be
at liberty to break the law which has been passed for the

protection of A.  Such an agreement might be illegal.
*  *  *  But it seems to me that if the supposed agree-
ment between the deceased and defendant, in consequence
of which the principle of ' *Volenti non fit injuria*' is sought
to be applied, comes to this: that the master employs  the
servant on the terms that the latter shall waive the breach
by the master of an obligation imposed on him by statute,
and shall connive at his disregard of the statutory obliga-
tion imposed on him for the benefit of others, as well as of
himself,—such an agreement would be in violation of pub-
lic policy, and ought not to be listened to."   A careful
reading of the opinions in *Durant v. Mining Co.*, 97 Mo.
62, (10 S. W. Rep. 448); *Grand v. Railroad Co.*, 83 Mich.
564 (47 N. W. Rep. 837, 11 L. R. A. 402); *Coal Co. v. Tay-
lor*, 81 Ill. 590, and *Boyd v. Coal Co.*, Ind. App. (50 N. E.
Rep. 368) cited in the *Narramore Case*, discloses that, al-
though the question might have been raised, it was not, in
any of them.   We think the learned judge, in writing that
opinion, assumed too much, in treating the assumption of
risk as purely a matter of contract.  True, the books speak
of it as resting on an implied agreement between the em-
ployer and employe.   It is more accurate to say that the
services of the one are engaged by the other, and from the
relationship the law  implies certain duties, obligations,
and disabilities.   No mention is made of these, but they
pertain to the relationship of  the parties and the status
then assumed.

Says Mr. Dresser, in his valuable work on Employers'
Liability (section 82):  "The contract of hiring depends
upon the same principles as other contracts, yet it has one
peculiarity, in that it creates a status or  relationship be-
tween the parties, to which the policy of the law has affixed
certain rights, duties, and disabilities to be observed by
each, irrespective of any understanding or supposed agree-
ment between them.   These duties and disabilities arise
when the relation is created, and continue until it ends,

and for the most part are determined by the condition of
affairs when the contract of hiring is made. It is usual and
convenient to treat them as terms of an implied contract,
but it is a contract implied from the relationship, and not
from the agreement of the parties, and has none of the in-
cidents of a technical contract." The author then points
out that no consideration is essential, as a mere volunteer
may be in the same position as though hired, and an infant
whose agreements are voidable may assume disabilities as
an adult. See *Barstow v. Railroad · Co.*, 143 Mass. 535,
(10 N. E. Rep. 255). If based on contract alone, then an
action for injury by the servant, resulting from a breach
of a duty assumed by the master, should be *ex contractu.*
As said in Jaggard Tort, 23: "Such rights and duties are not
properly contractual, nor is their breach a contract wrong."
See *Ames v. Railroad Co.*, 117 Mass. 541 (19 Am. Rep.
426). The breach is of a duty which the law implies from
their relationship, and is, like any other omission of duty
which the law exacts, negligence. The master's liability
may be tested either by considering the employe's conduct,
and answering whether, in view of his undertaking, he
took his chance on the particular act of which complaint
is made, or by ascertaining whether the employer owed
the employe any duty in relation thereto. While the first
may be the more convenient, the last is the more logical,
as it would seem inquiry should be directed to ascertain-
ing the existence of an obligation, before investigating its
possible breach. The employe undertakes the performance
of duties and services for compensation, and in doing so
takes upon himself the natural and ordinary risks and
perils incident to the performance of such services, and, in
legal assumption, the compensation is adjusted accord-
ingly. *Farwell v. Corporation*, 4 Metc. (Mass.) 49, 55 (38
Am. Dec. 339). That is, he engages to perform work
under certain conditions. If these are not changed, no
duty on the part of the master has been omitted. For

instance, if he undertakes to operate defective machinery, the master owes him no duty to repair. In such a case there is no waiver of liability, because none has arisen. But if he knew nothing of the defects, and they were not obvious, the law implies the obligation of the master to put it in safe condition for use. As said in *O'Maley v. Gaslight Co.*, 158 Mass. 135 (32 N. E. Rep. 1119, 47 L. R. A. 161): "The doctrine of assumption of risk of his employment by an employe has usually been considered from the point of view of a contract, express or implied; but, as applied to actions of tort for negligence against an employer, it leads up to the broader principle expressed by the maxim ' *Volenti fit non injuria*,' One who, knowing and appreciating a danger, voluntarily assumes the risk of it, has no just cause of complaint against another who is primarily responsible for the existence of the danger. As between the two, his voluntary assumption of the risk absolves the other from any particular duty to him in that respect, and leaves each to take such chances as exist in the situation, without right to claim anything from the other. In such a case there is no actionable negligence on the part of him who is primarily responsible for the danger. If there is a failure to do his duty according to a high standard of ethics, there is, as between the parties, no neglect of legal duty."

Nor can we approve of the distinction attempted to be drawn between employment under conditions condemned as dangerous at the common law, and those prohibited by a city ordinance. In the absence of an assumption of the risk, an omission of a duty implied by law is precisely as effective in fixing liability as though enjoined by statute. The obligation of the employer to the servant is no greater in the one case than in the other, and we can discover no sound reason for the discrimination which declares the danger in the one case may be assumed, and in the other

4. ASSUMPTION of risk: nature of risk.

may not. That advanced in two cited cases, to the effect that permitting the employe to waive the protection of a statute would be in contravention of sound public policy, we regard as untenable. The law implied is quite as much for his benefit, as that enacted by the city council. If he knows and appreciates the danger, and understands his rights under the statute, there is no more reason for putting him under guardianship, and prohibiting him from waiving lapses in duty of obedience to a rule established by an ordinance or statute, than to one which the principles of justice and public policy raise, independent of legislation, for his protection. Beyond the right of action accruing for the violation of the master's obligation, regardless of its source, is the punishment the state inflicts for the violation of the penal ordinance. The remedies are distinct, and the failure of the servant to demand his private remedy does not interfere with the exaction of a penalty by the state; nor, on the other hand, will the omission of the state to prosecute furnish the slightest obstacle to the maintenance of an action by the injured party. As said in the work from which we have already quoted: "It is difficult to see why, if the servant is given an action, he cannot barter it away before the cause of action accrues, as well as fail to bring it when he suffers injury. In neither case is the master's liability to the state affected, and the state ought not to call in the aid of an individual to enforce a policy it is competent itself to protect. For many reasons, the servant may prefer to forego the protection; and as this does not change the master's obligation under the statute, or affect the welfare of the state, it should be permitted. The means of protection, through information to the proper authorities, are at hand, if the servant or another chooses to avail himself of them; and, if he is content to work without safeguards which he has a right to expect, the loss should be his. * * * If the decisions quoted are to be followed, the odd

state of affairs will exist,—of a man who is merely care-
less being barred, but one deliberately undertaking a dan-
gerous work recovering.''

Some stress is laid on the impolicy of allowing persons
to waive obedience of an ordinance or statute. It would
seem quite as inimical to the public good to permit a work-
man to take advantage of the master's failure to obey the
law to which he has consented, as to permit the master to
avoid liability because the servant connived with him in
such disobedience, by agreeing to work with the conditions
as they existed, and according to the method mutually
adopted. In other words, it is quite as obnoxious to public
policy, independent of the penalty imposed, for the employe
to aid and encourage the employer in his disregard of an
ordinance, as for the employer to violate it. Our study of
the subject has led to the conclusion that, in the matter of
assumption of risks, it is immaterial whether they arise
from the violation of a common-law duty, or an obligation
imposed by statute. As directly in point, see *Knisley v.
Pratt*, 148 N. Y. 372 (42 N. E. Rep. 986, 32 L. R. A. 367);
*Carpet Co. v. O'Keefe*, 25 C. C. A. 220 (79 Fed. Rep. 900);
*Keenan v. Illuminating Co.*, 159 Mass. 379 (34 N. E. Rep.
366); Dresser, Employers' Liability, section 116. Also see
13 Law Mag. & Rev. 19; 3 Elliot, Railroad, section 1345;
*Electric Co. v. Allen*, Ala. (13 South. Rep. 8, 20 L. R. A. 457);
*Ford v. Railway Co.*, 106 Iowa, 85. In the first of the above
cases, the court, speaking through Bartlett, J. in referring to
the claim that public policy required the rigid enforcement
of a particular statute, and that this would be contravened
by permitting an employe by contract to waive its protec-
tion, said: ''We think this proposition essentially un-
sound, and proceeds upon theories that cannot be
maintained. It is difficult to perceive any difference in
the quality and character of a cause of action, whether it
has its origin in the ancient principles of the common
law, in the formulated rules of modern decisions, or

in the declared will of the legislature.    Public policy
in each case requires its rigid enforcement and it was never
urged in the common-law action for negligence that the
rule requiring the employe to assume the obvious risks of
the business was in contravention of that policy.    *   *   *
The rule as to risks of service or ordinary risks is entirely
distinct from the rule of obvious risks, and, if the statute
has added to the duties which the law enjoins upon the
employer before the servant can be subjected to the rule
of ordinary risks, then the default of the employer in the
discharge of this statutory duty, resulting in the injury
to the employe, would enable the latter to sue.    Such a
construction of the statute would not in any way limit the
doctrine of obvious risks.    *   *   * We are of opinion
that there is no reason, in principle or authority, why an
employe should not be allowed to assume the obvious
risks of his business, as well under the factory act as
otherwise.    There is no rule of public policy which pre-
vents an employe from deciding whether, in view of in-
creased wages, the difficulties of obtaining employment,
or other sufficient reasons, it may not be wise and prudent
to accept employment subject to the rule of obvious risks.
The statute indeed contemplates the protection of a cer-
tain class of laborers, but it does not deprive them of their
free agency and the right to manage their own affairs.''
The appellant urges that as, under our statute, contracts
exempting the company from liability are void, there can
be no assumption of such a risk.    The answer to this is, as
already remarked, that in such a case no liability arises,
and hence there is none from which the contract exempts.
Possibly ordinances or statutes might be so framed as to
prevent any assumption of risk, but certainly this is not
true of an ordinance general in its terms, limiting the
speed of trains in a particular locality.    And it can make
no difference whether the statute relates to the condition
of the place where the work is to be done, or the method

to be pursued in performing it.  If the employe, with full knowledge of either, undertakes to accomplish the task assigned at the place or in the method proposed, he ought not to be permitted to complain, when conditions and methods were precisely as he knew they would be, and to which he has assented.

II.  The finding that deceased assumed the risk of injury from the excessive rate of speed within the corporate limits of the city of Davenport leads inevitably to an approval of the court's ruling in directing a verdict for defendant.  It appears to have been deceased's duty to be on top and near the front of the train until the semaphore was reached. After that it was customary to go to the engine.  At the next station the helper engine was usually uncoupled and returned, though it frequently went as far as Turnout, 3.6 miles beyond Farnam.  But two witnesses observed deceased shortly before the accident.  Staffenbiel, a policeman, testified that he saw the train east of Marquette street, and noticed the head brakeman on top, about six cars from the engine, going forward.  McMullen, the rear brakeman, testified: "I stayed on top till near the semaphore.  *  *  *  I saw Mr. Flanagan's light about the time I got to the semaphore.  It was near the head end of the train.  I could not tell how far from the engine.  The light was higher up than it would be if it was setting on the car.  I could not see the head end of the train, for smoke and steam which came directly back over the train. *  *  *  I was on top till the engine got by the semaphore at Southwest Junction."  He then went to the caboose. The appellee rightly insists, as we think, that the only reasonable inference to be drawn from the testimony is that deceased fell while attempting to step from the fourth to the third car in going forward to the engine.  The latter was a foot lower than the former, and he may have lost his balance in stepping down, possibly not noticing

*SPEED of trains: operating cause of injury.*

the difference, in the dark and smoke from the engine.
From the place where Staffenbiel saw him, he would likely
have reached the end of the fourth car in an ordinary walk,
while the train was moving, to the point where he fell.
The position of the light when last seen by McMullen ob-
viates the inference suggested by appellant that he was
sitting down, and he would not be likely to fall where he
did when standing still.    But whether he fell while at-
tempting to step to another car, or while standing or sit-
ting near the end, there is nothing in the record tending
to explain the cause of the fall.    It was still dark, with
the smoke and steam trailing close to the train.    The
weather was cold, and rendered more disagreeable by the
humidity of the atmosphere.    But these were conditions
which deceased was bound to anticipate when taking em-
ployment as brakeman.    Whether they had anything to do
with the accident can never be known.    The jury could
have found that the train was moving at from twelve to
thirty miles an hour, but it is utterly impossible to say
from the evidence that going faster than twelve miles an
hour, with which deceased was familiar, caused him to fall,
and that this would not have happened if moving at a less
speed.    If the cars swayed in passing over the blocks and
switches, he knew that fact better than any one else, and
ought not to have attempted to go to the engine until these
were passed.    Recovery must be had, if at all, because of
negligence in the rate of speed.    Compliance with the or-
dinance having been waived by deceased, in not only con-
senting, but assisting in operating defendant's trains at a
rate of from eight to twelve miles an hour, there is no lia-
bility, unless it can be said that the speed at which this
train run, above that mentioned, was not only negligence,
but that it was the operating cause of the injury.    As the
speed above that mentioned, the risks of which he had
assumed, cannot be said to have occasioned his death, we

need not inquire whether defendant was negligent, independent of the violation of the city ordinance.

The ruling of the district court is approved, and its judgment AFFIRMED.

WEAVER, J., concurs in the result.