## William Keeley, Administrator, Appellee, v. Cleveland, Cincinnati, Chicago & St. Louis Railway Company, Appellant.

1. Contributory negligence—*what may be considered by the jury in death case.* Where there was no eye witness to the accident the jury has a right to take into consideration evidence as to the habits of care of the deceased and also the natural instinct of self-preservation.

2. Master and servant—*when violation of rule precludes recovery.* If a servant with knowledge of the existence of a rule adopted and enforced by his master to secure the safety of his servants, knowingly violates the same, no damages can be recovered for his death, and it is for the jury to determine whether a rule which the servant violated is applicable under the particular circumstances of the case.

Action in case for death caused by alleged wrongful act. Appeal from the City Court of Mattoon; the Hon. T. N. Cofer, Judge, presiding. Heard in this court at the May term, 1910. Reversed and remanded. Opinion filed October 18, 1910.

George B. Gillespie, for appellant; L. J. Hackney, Hamlin, Gillespie & Fitzgerald and James Vause, Jr., of counsel.

Voigt & Brookings and F. C. Smith, for appellee.

Mr. Presiding Justice Puterbaugh delivered the opinion of the court.

This is an action on the case by appellee as administrator, against appellant, to recover for the death of his intestate, Walter E. Keeley, a brakeman who met with his death while in the employ of appellant. The trial in the Circuit Court resulted in a judgment against the defendant for $500, to reverse which this appeal is prosecuted.

The first count of the declaration, after alleging the relation of master and servant, charges that the death of the plaintiff's intestate Keeley resulted from the negligence of the defendant in allowing a portion of

its switch track near the station of Middlesworth, to remain in unsafe repair and condition, and permitting certain ties and the ends of certain ties to remain above the surface of the ground; and permitting the south rail of said switch track to remain above the surface of the ground; and in failing to have the ground between the ties and the bottom of said rail, and between the ends of the ties, so filled up that said Keeley would not be exposed to danger while attending to his duties as brakeman; and that while said Keeley in the performance of his duties, in uncoupling cars passing along and upon said switch track, was standing and walking upon a portion of said switch track, and while he was making a coupling between certain cars and an engine, at the head of said engine, and while he was standing and walking upon and along said portion of said switch track, which he was obliged to do in order to get upon the pilot of said engine and ride along and upon said switch track, to make couplings and uncouplings of cars, he was unnecessarily exposed to danger, and that he then and thereby stumbled over and upon said ties and fell between the pilot of said engine and said cars attached thereto, upon the south rail of said switch, and was run over and killed. The second count charges that Keeley stumbled and fell by reason of the projecting ties. The third count charges that he caught his foot in the track and rails of said switch track and stumbled and fell over said ties which remained above the surface of the ground, and thereby unavoidably fell to and upon one of the tracks of the defendant.

The plaintiff's intestate, Walter E. Keeley, who had been in the service of the defendant railroad company for several weeks, was at the time he met with his death, acting as head brakeman on an extra freight train, which arrived at Middlesworth station about two o'clock in the afternoon. It first stopped about three-quarters of a mile west of the station, headed into

what was known as the eastbound track, and then
pulled up to within about 500 feet of the station and
stopped at a point just west of where the east end of
the eastbound passing track connected with the main
track, the switch being on the south side of the main.
East of the station, about the same distance as the
east end of the eastbound passing track from the sta-
tion, was the west end connection between the west-
bound passing track and the main track. These two
switch tracks were connected with each other by what
was called the commercial track, which lay immediately
south of the station building and platform; the com-
mercial track, together with said switch tracks, thus
forming a continuous line of track on the south side
of the main track. When the train stopped, Keeley,
who was riding on the south step of the locomotive, got
off and uncoupled it from the train, then returned to
the step on the south side of the locomotive and rode
from the switch track through the commercial track to
the westbound siding, proceeded to couple the front
end of the locomotive to several coal cars, and then
gave a signal to the engineer, who backed his locomo-
tive down to a point in front of the station at the rate
of three or four miles an hour. The conductor, as the
cut of cars passed the station, instructed the engineer
and brakeman to leave the east car of the cut on the
westbound siding. He then climbed into that car,
while Keeley ran along the side of the car and raised
the lift-rod to uncouple that car as it was shoved back
on the westbound siding. When he arrived at the south
side of the cut of cars between the first and second
car of the cut, and had uncoupled the car, upon his
signal the engineer stopped the cut, backed up with
the remainder of the cut, and pulled the cars down
again to a point near the station on the commercial
track, and stopped. The last time the engineer saw
Keeley he was running along by the side of the cars
about the length of a car and a half from the engine,

and had reached a point about 300 feet east of where the engineer finally stopped the locomotive on the commercial track. The next duty to have been performed by Keeley in the course of his work was to uncouple the cars from the locomotive. As he failed to do so, the fireman left the cab of the locomotive in search of him, and found him lying dead between the tracks on the commercial switch near the south rail.

The evidence as to what caused his death is altogether circumstantial. The locomotive and the coal car next to it were equipped with lifting rods and automatic couplers. The locomotive was equipped with a hand-hold and a rough iron step at the bottom of the pilot beam sill, which extended outside of the rail a foot or more. The evidence further shows that the ballast between the rails did not completely cover all of the ties; that it covered the ties in the center of the track and sloped down toward the ends of the ties, leaving at some places from one to three inches of the ties exposed, and that under the rails in some places there was a space of two to three inches which was not filled with ballast, and that some of the ties turned up at the ends. The cars completely overhung the ties.

The plaintiff, over the objection of the defendant, proved by a number of witnesses, that on various occasions they had seen brakemen riding on the steps of locomotive pilots on the defendant's road, while the locomotives were doing switching at Middlesworth, Mattoon and other stations of the class of Middlesworth, upon defendant's railway.

It was shown by the defendant, that when Keeley entered into the employment of the defendant railway company, he was furnished with a copy of the book of rules governing the operation of its railway, among which was the following: "E. All train men, switch men and other employes are prohibited from stepping upon the front of approaching engines or cars, jump-

ing on or off engines or cars moving at high speed, going between cars in motion to couple or uncouple them, or for any other purpose whatever." The evidence further shows that at the time of his employment he signed a statement as follows: "I have been warned against the danger of reaching between cars to uncouple them in the event of any of the parts becoming broken or disconnected or reaching across draw bars either over or under, for the purpose of turning angle cocks or for any reason, and I hereby promise that I will not place myself in any hazardous position of this kind under any circumstances." The evidence further shows that Keeley was sober, active, careful and competent.

The defendant also adduced evidence tending to prove that the track where the deceased was killed had been ballasted with cinders, which completely filled the space between the rails to the top of the ties, except in some instances an inch or two of the ties projected above the level of the cinders; that at the point where the body was found and for fifteen or eighteen feet in either direction from that point, cinders completely covered the ties. The engineer of maintenance of way and road supervisor for the Illinois Central railroad company testified that they were familiar with the commercial track, and that the ballasting thereon was done in accordance with the rule for ballasting such tracks upon first class railroads throughout the country.

The undertaker who took charge of the body of Keeley after his death, testified that his right foot was cut off and the heel crushed; that the left foot was crushed and one toe cut off; that both arms were cut off; that there were holes in his head and in his right breast; that he had on heavy shoes, practically new, and that the sole of one of his shoes looked as though it had been crushed and had the imprint of a rail across the bottom.

A motion was made by the defendant at the conclusion of the plaintiff's evidence, and again at the close of all the evidence, to direct a verdict in favor of the defendant. It is urged as error that the court erred in overruling said motion, for the alleged reason, among others, that the record fails to disclose the cause of Keeley's death or that the same was the result of the negligence of the defendant as charged in the declaration. No one witnessed the accident, or the occurrences immediately prior thereto, but the manner of death could be properly proved by circumstantial evidence. Waschow v. Kelly Coal Co., 245 Ill. 516. We think it may be rationally inferred that the deceased either struck a projecting tie and stumbled and rolled under the wheels of the car; struck a tie while attempting to step upon the step of the engine pilot, causing him to lose his balance and fall under the car, or got one foot caught under an insufficiently ballasted rail while attempting to step upon the foot-board which projected outside of the rail a foot or more, and being unable to extricate himself, was caught and crushed by the car. The testimony of the undertaker above referred to, as to the marks on the shoes of the deceased, would indicate that the latter was the case. We are unable to say, as a matter of law, that there is no evidence in the record from which the jury could reasonably deduce that the deceased was killed by reason of the negligence of the defendant as charged in the declaration. Upon the question of due care, the jury had a right to take into consideration the evidence as to the habits of the deceased, and also the natural instinct of self-preservation. R. Co. v. Beaver, 199 Ill. 36. It cannot be said that there was no evidence fairly and reasonably sufficient to warrant the jury in inferring that the deceased was in the exercise of due care and caution at the time he met with his death. We therefore conclude that the court did not err in refusing to direct a verdict for the defendant.

As the judgment must be reversed and the cause remanded for the reasons hereinafter set forth, we shall not further discuss the evidence nor determine where the preponderance lies upon the controverted issues of fact.

By the fourth instruction given at the request of the plaintiff, the court told the jury that the rule "E" hereinbefore quoted, had "no application to a brakeman while in the discharge of his duty going between an engine and a car moving at a slow rate of speed, for the purpose of getting upon the foot-board of the engine to uncouple such engine from such car." It was error to give the foregoing instruction. Whether or not the rule was applicable under the circumstances detailed in the instruction was a vital question in the case, for if an employe with knowledge of the existence of a rule adopted and in force by his employer, to secure the safety of his employes, knowingly violates the same, no damages can be recovered for his death. R. R. Co. v. Houck, 72 Ill. 285; R. R. Co. v. Whitcomb, 111 Ind. 212; Russell v. R. R. Co., 47 Fed. 204; Grand v. R. R. Co., 83 Mich. 564; R. R. Co. v. Rice, 51 Ark. 467; Ford v. R. R. Co., 91 Iowa, 179. We are of opinion that a fair and reasonable construction of the rule is that it not only prohibits brakemen from going between cars to couple or uncouple them, or going between a car and a locomotive for the purpose of coupling or uncoupling them, from standing upon the front of approaching engines or cars, or jumping on or off engines and cars when moving at a high rate of speed, but that it also prohibits them from going between cars or an engine and a car in motion to couple or uncouple them or for any other purpose whatever. It seems to us that the foregoing construction is consonant with the object to be obtained,—that is, the safety of the employes. We think the construction given by the court to the word "cars" as employed in the rule is too restricted, and unreasonable. It is obvious that to go between an engine and a car while

the train is in motion is as dangerous as going between two cars, under the same circumstances. The word "cars" in the connection used must be held to include locomotives. The effect of the giving of the instruction in question, therefore, eliminated the defense based upon the alleged violation of the rule, and the defendant was obviously prejudiced thereby.

The judgment of the Circuit Court will be reversed and the cause remanded.

*Reversed and remanded.*