DENVER & R. G. R. CO. v. NORGATE.

(Circuit Court of Appeals, Eighth Circuit. October 20, 1905.)

No. 2,110.

1. MASTER AND SERVANT—EMPLOYERS' LIABILITY STATUTE—SCOPE.

The Colorado employers' liability act (Laws 1893, p. 129, c. 77) applies only in cases founded on rights created thereby, and the provision requiring notice of an injury to be given by an employé within 60 days as a condition precedent to suit has no application to a suit upon a right of action given by the common law.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, § 806.]

2. SAME—FROG BLOCKING ACT—ASSUMPTION OF RISK.

    Laws Colo. 1897, p. 258, c. 69, requiring all railroad companies to securely block all frogs and switch rails, does not deprive a railroad company, when sued for injury to an employé resulting from its failure to observe such law, of the right to defend on the ground of assumption of risk.

    [Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, § 545.

    Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.

    Duty of railroad company to block switches, see note to Hauss v. Lake Erie & W. R. Co., 46 C. C. A. 98.]

3. TRIAL—INSTRUCTIONS—REFUSAL OF REQUEST TO DEFINE ORDINARY CARE.

    Where an issue of ordinary care or reasonable care is submitted to the jury for determination, it is error for the court to refuse a requested instruction correctly defining such terms.

    [Ed. Note.—For cases in point, see vol. 46, Cent. Dig. Trial, § 489.]

In Error to the Circuit Court of the United States for the District of Colorado.

Norgate sued the railroad company to recover damages for injuries to his person, caused as he alleges by the negligence of the company. He stated his cause of action as follows: "That at the times hereinafter mentioned the defendant was the owner and operator of a certain line of railroad in the state of Colorado, and was also the owner of certain railroad yards containing a large number of switches, frogs, and guard rails in the city of Pueblo, in the state of Colorado, at which place said defendant was at all times hereinafter mentioned switching cars and trains in the said yard. That on the 12th day of May, 1903, plaintiff was in the employ of the defendant in its yards in Pueblo, Colo., as yard conductor or foreman of a switch crew, and it then and there became and was the duty of the defendant to take all reasonable precautions to keep the frogs and the space between the guard rails and main rails in said yard blocked, and to take all reasonable precautions to keep its cars and the couplings and other appliances connected therewith which plaintiff was required to use in the performance of his duties in good repair and in a reasonably safe condition for plaintiff in the performance of his duties. But said defendant disregarded its duty in that behalf, and conducted itself so carelessly, negligently, and unskillfully that by and through its carelessness, negligence, and default it received on its tracks and into its yards at Pueblo, Colo., and caused to be handled and moved about therein, a certain freight car of the Chicago, Rock Island & Pacific Railroad Company, which said car was equipped with an automatic coupler which was defective and out of repair, in this: That the lever connected with said coupler for the purpose of raising the pin, in order to permit said couplers to open and separate when uncoupling cars, either because the chain connecting said lever with the coupling pin was too long, or because the said lever was twisted out of its proper shape, would not, when raised up and hooked on an iron provided for that purpose, hold the said pin high enough to permit said coupler to open and separate, as it was designed and intended to do when so hooked, in order to avoid the necessity of walking along the side of the car and holding the lever up until the couplers opened and the cars separated, which said defective condition might have been easily discovered by an ordinary inspection, and might by the exercise of reasonable care have been known to the defendant, but which was unknown to plaintiff; and said defendant negligently, knowingly, and willfully permitted its frogs and the space between its guard rails and main or other adjacent rails of its tracks in its yards at Pueblo, Colo., to be and remain unblocked, and the said plaintiff, on the 12th day of May, 1903, in the performance of his duties as employé of the defendant, undertook to uncouple said above-mentioned car of the Chicago, Rock Island & Pacific Railroad Company from another car in a train then being moved in the said yards of the defendant, for the purpose of switching it and other cars on to another

track, and he then and there discovered that said coupling apparatus was out of repair, as aforesaid, making it necessary for plaintiff to hold said lever while said cars were moving until said couplers would separate, and while so doing plaintiff's left foot was, because of said defective condition of said coupler and of the failure of defendant to keep blocked the space between the guard rail and the main rail of what is known as 'track number 2,' connecting the lead track in said yards, which was unknown to plaintiff, caught between said guard rail and main rail, and he was then and there, by reason of being so caught, thrown to the ground in such a manner that the moving cars which he was attempting to uncouple passed over his right leg, bruising, wounding, and crushing the same between the ankle and knee in such manner that it became and was necessary to have the same amputated above the knee."

The railroad company answered the complaint of Norgate, and among other defenses pleaded the following: "For a second and further defense to the matters and things alleged in the plaintiff's complaint, this defendant denies that the plaintiff herein did, within 60 days after the alleged sustaining by said plaintiff of the personal injuries in said complaint described, serve upon this defendant any notice thereof as required by the statutes of the state of Colorado in such case made and provided. * * * For a fifth and further defense, the company pleaded such facts as, if true, would tend to show that Norgate had assumed the risk of injury from the unblocked guard rail."

Norgate demurred to the second and fifth defenses pleaded in the answer of the railroad company, and the demurrer was sustained. No exception, however, seems to have been taken to this ruling. The action was subsequently tried and resulted in a verdict for Norgate.

At the trial counsel for the railroad company requested the court to charge the jury as follows: "(1) The jury are instructed that if the plaintiff knew, or in the exercise of reasonable care might have known, that the frogs and guard rails in the defendant's yards at Pueblo were generally unblocked, but that notwithstanding such knowledge or means of knowledge, the plaintiff continued to work in and about said yards, then the plaintiff assumed the risk of the accident complained of herein, and your verdict must be for the defendant. (2) You are further instructed that ordinary or reasonable care, as used throughout these instructions, is such care as a reasonably prudent man would exercise under like circumstances and conditions to those shown in evidence."

Each of these requests was refused, and an exception taken to such refusal. At the close of the evidence counsel for the railroad company moved the court to direct the jury to return a verdict in favor of the company, for the following, among other, reasons: "That the plaintiff has failed to allege or prove that any written notice of the time, place, and cause of the injury complained of herein was given by him or in his behalf to the employer within 60 days from the occurrence of the accident causing the injury complained of." The motion for a directed verdict was denied, and an exception taken.

William P. Cooney, a witness for the railroad company, testified as follows: "Q. What is your business? A. Roadmaster. Q. For what company are you working? A. The Denver & Rio Grande Railroad Company. Q. How long have you been employed with that company? A. Since the 28th of March, 1879. Q. Are you acquainted with the condition of the yards of the Denver & Rio Grande Railroad Company at Pueblo, with reference to whether or not the guard rails and frogs are blocked? A. Yes, sir, I am. * * * Q. Are there any blocks in them there? A. No, sir. Q. Have there ever been, to your knowledge? A. Never. Q. How long have you worked for the company? A. Since 1879. Q. Is that true with reference to the entire system? A. The entire system, I have worked over all the system and never saw one blocked. Q. Were any of the guard rails and frogs in the yards of this defendant company at Pueblo, in May, 1903, blocked? A. No, sir. Q. Nor had they ever been blocked prior to that time? A. No, sir. Q. Are you acquainted with the plaintiff in this case, Mr. Norgate? A. I have heard of him. Q. You know about when the accident happened? A. Yes, sir. Q. Were any of the guard rails or frogs of the Denver & Rio Grande Railroad Company, at Pueblo, blocked at that time? A. No, sir. Q. Or any time prior thereto? A. No, sir."

At the time Norgate received his injuries there existed in Colorado a statute found in chapter 69, pp. 258, 259, of the Session Laws of 1897, which reads as follows:

"Section 1. Where, after the passage of this act, personal injury is caused of all corporations, companies and persons using, maintaining, operating or controlling any railroad or railroad track to safely and securely block between the switch rails going into each of the head-chairs for a distance of six feet from each and every head-block, and to safely and securely block between the rails from the point where the iron filling which extends from the point of each frog ends, for the distance of four feet from the end of said filling, and to safely and securely block between each and every guard rail and the main, or other adjacent rail, for the entire distance of the curve or curves, in all guard rails, at both ends of each and every guard rail, and to safely and securely block between the rails in each and every wedge of all frogs, and to separate and securely block for a distance of five feet from the end of each and every split rail between said split rail and the adjacent rail of all split switches.

"Sec. 2. In all trials in all courts in this state to recover for personal injury, and in all cases of personal injury to employés or other persons, occasioned by or in any manner directly or indirectly, resulting from being caught between any of the aforesaid rails, testimony relative to the compliance with the requirements of this act shall be admitted, and where a failure is shown on the part of any such corporation, company or person, to have safely and securely blocked such rails, in accordance with the provisions of this act, such failure to have complied with any of the provisions of this act shall be prima facie evidence of the negligence of any such corporation, company or person so failing to comply with any of the provisions of this act, where any such employé or other person may be caught between such rails not blocked in accordance with the provisions of this act."

At the same time there existed what is known as the "Colorado Employers' Liability Act," Laws 1893, p. 129, c. 77. Sections 1 and 4 of this last-mentioned act read as follows:

"Section 1. Where, after the passage of this act, personal injury is caused to an employé who is himself in the exercise of due care and diligence at the time, first, by reason of any defect in the condition of the ways, works or machinery connected with, or used in the business of the employer, which arose from, or had not been discovered or remedied owing to the negligence of the employer, or of any person in the service of the employer, and entrusted by him with the duty of seeing that the ways, works and machinery were in proper condition; or, second, by reason of the negligence of any person in the service of the employer entrusted with exercising superintendence, whose sole or principal duty is that of superintendence."

"Sec. 4. An employé, or those entitled by law to sue and recover under the provisions of this act, shall not be entitled under this act to any right to compensation or remedy against his employer in any case where such employé knew of the defect or negligence which caused the injury, and failed within a reasonable time to give or cause to be given, information thereof to the employer, or to some person superior to himself in the service of his employer, who had entrusted to him some general superintendence."

Henry A. Dubbs (Thomas H. Devine, Wolcott, Vaile & Waterman, and J. W. Preston, on the brief), for plaintiff in error.

T. M. Morrow (William T. Skelton, on the brief), for defendant in error.

Before SANBORN, Circuit Judge, and PHILIPS and CARLAND, District Judges.

CARLAND, District Judge, after starting the case as above, delivered the opinion of the court.

An examination of the evidence contained in the record has satisfied us that the question as to whether Norgate contributed by his own want of ordinary care to his injuries, was properly left by the court to the jury. Whether the coupler on the freight car was defective and out of repair, or not, seems to be of little consequence, as the condition of the coupler does not seem to have been in any sense the proximate cause of Norgate's injuries. He was not injured by any defect in the coupler. The business in which Norgate was engaged when he was injured was properly shown as part of the res gestæ and as evidence relevant to the question as to whether Norgate, at the time he received his injuries, was in the exercise of ordinary care. But laying aside the question of contributory negligence—and upon this point we intimate no opinion—Norgate, when injured as described in the evidence, was in the lawful performance of his duty, and was injured by having his foot caught between the guard rail and the main rail, as he testifies.

The other questions arising on the record are these: First. Did the trial court err in holding that section 4, of the Colorado employers' liability act did not apply to this case? Second. Did the trial court err in holding that the defense of assumption of risk was not available to the railroad company, by reason of the frog blocking act of 1897? Third. Did the court err in refusing to define in its charge to the jury, when requested by counsel for the company, "ordinary care" as applied to the case on trial? These questions will be discussed in the order in which they are stated.

Conceding that section 4 of the act of 1893 has been in no way impaired by any subsequent statute of the state of Colorado, we are of the opinion that this action cannot be said to arise under it, or under the act of 1901, mentioned in the opinion of this court in Lange v. Union Pacific Railroad Company, 126 Fed. 338, 62 C. C. A. 48. The right of Norgate to institute the present action against the railroad company existed at common law, and in regard to such action we do not understand that said section 4 of the act of 1893 applies. No mention is made in the complaint in this action of a statute of Colorado, and it ought not to be held that a statute enacted to enlarge the liability of the master has resulted in restricting it, unless such a result is unavoidable. In Ryalls v. Mechanics Mills, 150 Mass. 190, 22 N. E. 766, 5 L. R. A. 667, the Supreme Court of Massachusetts had occasion to construe a similar law of that state, and held that in those cases within the words of the statute in which the common law gives an employé a remedy, he still has a right to sue under the same conditions, and to recover damages to the same extent as if the statute had not been passed, and that the requirement in regard to notice only applied to those cases laying outside the common-law rule. We do not feel sure that the question as to the proper construction of the act of 1893 with reference to the point under discussion is an open one, as the Supreme Court of Colorado in Colorado M. & E. Co. v. Mitchell, 26 Colo. 285, 58 Pac. 28, construed said act, and held that it in no manner prejudiced the common-law rights of employés, or interfered with the enforcement of any right that the

statute itself did not create. Massachusetts copied the statute from England, and Colorado from Massachusetts. At the place of its origin and adoption it has received the same construction.

The decision of the second question might, under the rule of stare decisis, be controlled by the cases of St. Louis Cordage Company v. Miller, 126 Fed. 495, 61 C. C. A. 477, 63 L. R. A. 551, and Glenmont Lumber Co. v. Roy, 126 Fed. 524, 61 C. C. A. 506. But it is claimed by counsel for Norgate that the question at issue was not the principal question discussed in those cases, and that the present case can be clearly distinguished from them, for the reason that the statutes of Missouri and Minnesota, which were considered in the cases cited, did not attempt to impose the performance of any specific duty by the master. Hence the question of reasonable care is not eliminated by the provisions of those statutes. Again, it is urged that, so far as the statute of Minnesota is concerned, it had been construed by the Supreme Court of that state in Anderson v. Nelson Lumber Co., 69 N. W. 630, and in Swenson v. Osgood, Blodgett Mfg. Co., 98 N. W. 645, prior to the decision in Glenmont Lumber Co. v. Roy, supra, and that this court of necessity followed the construction given to the statute by the Supreme Court of Minnesota.

We are clearly of the opinion that the frog blocking act of Colorado, quoted in the statement of facts preceding this opinion, did not take away from the railroad company the defense of assumption of risk in this case, and as our opinion is apparently opposed to the opinion of courts of learning and ability, we will state briefly the reasons for our judgment. It is conceded that the common law declares that Norgate, when he entered the employ of the railroad company, assumed all the risks and dangers of his occupation which were known to him, and all of which a reasonably prudent man in his situation would have known. By the ruling of the trial court this old and well-established rule of the common law was held to have been repealed by the statute of Colorado, providing for the blocking of frogs and guard rails. We first naturally turn to the law itself to find the repeal. We find the law expressed in clear, unambiguous terms, and, this being so, we are not permitted to go elsewhere to find the meaning and intention of the lawmaking power. Nothing whatever is said in the law as to assumption of risk. The Legislature could have easily repealed this principle of the common law above quoted, as other Legislatures have done. Code Iowa 1888, § 2002; Acts Tex. 1891, p. 25, c. 24; Acts Fla. 1891, p. 113, c. 4071; Acts Wyo. 1890–91, p. 350, c. 80, § 17; Burns' Ann. St. Ind. 1901, § 708. But, instead thereof, the Legislature simply imposed the duty upon railroad companies of blocking their frogs and guard rails, and further provided that a failure to do so should be prima facie evidence of negligence.

It is, however, conceded that there is nothing in the terms of the law which expressly repeals the law of assumption of risk; but it is contended that, if the defense of assumption of risk is allowed in actions like the one at bar, then the servant can contract the master out of the statute, and thereby render the statute of no force or ef-

fcct.   In other words, it is contended that, as the law of assumption of risk is a term of the contract between the master and servant, to allow the master the defense of assumption of risk in the case at bar would be to allow private parties to render nugatory by their contracts a public statute of the state of Colorado.   The error in this contention is in assuming that the law of assumption of risk is created by the contract between master and servant.   This error, we believe, has led some courts to enunciate a false doctrine in regard to the question under discussion.   A representative case among those which hold that statutes imposing a positive duty upon the master by implication repeal the law of the assumption of risk, is the case of Narramore v. Cleveland, C., C. & St. L. Ry. Co., 96 Fed. 298, 37 C. C. A. 499, 48 L. R. A. 68.   As this case has been followed by at least one of the state Supreme Courts (Green v. Western American Co., 30 Wash. 87, 70 Pac. 310), we propose to show wherein we think the reasoning of the learned court in the Narramore Case is not only faulty, but that, so far as the decision is based upon the decisions in England, a wrong conclusion was drawn as to what those decisions hold the law to be.   The court in the Narramore Case, in our opinion, fell into error when it declared the law to be as follows:

"An assumption of risk is a term of the contract of employment, expressed or implied, by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's duty, shall be at the servant's risk."

Is it possible that an old, established principle of the common law depends for its existence in each case of employment upon the agreement of the parties?   The law regarding the assumption of risk is the law which governs the relation of master and servant, and is independent of the will of either.   It is not a term of the contract of employment.   If it were, then the master and servant could retain it or abolish it in each contract of employment.   But they can do neither.   It is a principle of the common law, and must be repealed, if at all, by the lawmaking power.   It is the law of the land governing all persons who assume the relation of master and servant.   It is over and above the contract, and depends in no manner for its existence upon the agreement of the parties.   It is founded upon public policy, the status assumed by master and servant, and upon the maxim, "Volenti non fit injuria."   The law establishing the reciprocal duties and obligations of master and servant never originated out of contract, in the sense that the master and servant ever expressly agreed to them.   But the common law imposed these duties and obligations as a regulation of those who assumed this relation, regardless of the desires of the master or the servant.   So, in our opinion, to say that the servant may contract the master out of the statute is a misuse of terms.   If the master escapes liability on invoking the law in regard to the assumption of risk, he escapes because of the law, not because of any contract.   If the law is a bad law, let the Legislature repeal it.   We take the position that an old and well-established rule of the common law cannot be lawfully repealed, except by the lawmaking power, and that any attempt of the courts

to do so is a plain usurpation of a legislative function. All the reasons urged upon us why we should hold the law of assumption of risk repealed by the Colorado statute might appeal to the Legislature, but are wholly out of place in this court. The statute of Colorado imposes no penalty for its violation, and therefore may be classed with those laws known as "Employers' Acts," rather than with the law considered in the Narramore Case. But the contention that the law of assumption of risk is created by the contract between master and servant, if sound, applies to both, and, if it is unsound as to one, it is unsound as to the other. The decision of the court in the Narramore Case, so far as it is based on the decisions in England, follows Baddely v. Granville, 19 Q. B. Div. 423.

We are not satisfied that the excerpt quoted in the opinion in the Narramore Case correctly reflects the opinion of the court as a whole in the case quoted from. The Supreme Court of Alabama in the cases of Railroad Company v. Holborn, 84 Ala. 133, 4 South. 146, and Railroad Company v. Walters, 91 Ala. 435, 8 South. 357, held that the employers' act of that state, which was a substantial copy of the English act of 1880, abolished the law of assumption of risk, and based their decision on Weblin v. Ballard, 17 Q. B. Div. 122. In Birmingham Railway & Electric Co. v. Allen, 99 Ala. 359, 13 South. 8, 20 L. R. A. 457, the question again came before the Supreme Court of Alabama, and after a careful review of the English authorities and the case of Ryalls v. Mechanics Mills, 150 Mass. 190, 22 N. E. 766, 5 L. R. A. 667, overruled the cases of Railroad Company v. Holborn and Railroad Company v. Walters, supra, and decided Weblin v. Ballard, 17 Q. B. Div. 122, had been virtually overruled by the case of Thomas v. Quartermaine, 18 Q. B. Div. 685, and that the rule "Volenti non fit injuria" had not been modified by the English courts. We think that a careful examination of the following English cases will show that the Supreme Court of Alabama was right in its conclusion: Thomas v. Quartermaine, 18 Q. B. Div. 685; Yarmouth v. France, 19 Q. B. Div. 647; Smith v. Baker, App. Cas. [1891] p. 325; Osborn v. London & N. W. Ry. Co., 21 Q. B. Div. 220; Walsh v. Whiley, 21 Q. B. Div. 371; Briton v. Great Western Cotton Co., L. R. 7 Ex. 130.

In addition to the reasoning of this court in St. Louis Cordage Co. v. Miller, 126 Fed. 509, 61 C. C. A. 477, 63 L. R. A. 551, and Glenmont Lumber Co. v. Roy, 126 Fed. 525, 61 C. C. A. 506, it will be instructive to notice what other courts and text-writers have said upon the subject.

The Supreme Court of Rhode Island, in Langlois v. Dunn Worsted Mills, 57 Atl. 910, 911, said:

"The question whether a plaintiff can recover for a breach of statutory duty, notwithstanding an assumption of risk or contributory negligence on his part, is one on which there is some difference of opinion, but we think the clear weight of reason and authority is against such recovery. A statutory duty is no more imperative in law than a common-law duty. A penalty may be imposed upon the offender for a breach of statute, but it does not change the relations between the parties, except to the extent that one entering the employ of another may assume, in absence of knowledge, that the terms of the statute

have been complied with. * * * It is also well settled that a court will not presume that a statute intended to change a rule of common law unless such an intent appears. * * * It has been common practice here and elsewhere to construe statutory duties in connection with assumed risks and contributory negligence. For example, ever since the advent of railroads, statutes have required the sounding of a bell or whistle in approaching a highway crossing. Yet, though the statute should be negligently disregarded, it has never been held that a plaintiff seeing the approach of a train, and injured while attempting to cross ahead of it, could recover. He would be held to have assumed the risk of so crossing, or to have been guilty of contributory negligence. The mere fact that the railroad company had violated the statute would not warrant a recovery."

In the case of Martin v. C. R. I. & P. R. Co., 118 Iowa, 148, 91 N. W. 1034, 59 L. R. A. 698, 96 Am. St. Rep. 371, the court discusses and disapproves of the Narramore Case, using the following language:

"We think the learned judge, in writing that opinion, assumed too much, in treating the assumption of risk as purely a matter of contract. True, the books speak of it as resting on an implied agreement between the employer and employé. It is more accurate to say that the services of the one are engaged by the other, and from the relationship the law implies certain duties, obligations, and disabilities. No mention is made of these, but they pertain to the relationship of the parties and the status then assumed. * * * Nor can we approve of the distinction attempted to be drawn between employment under conditions condemned as dangerous at the common law and those prohibited by a city ordinance. In the absence of an assumption of the risk, an omission of a duty implied by law is precisely as effective in fixing liability as though enjoined by statute. The obligation of the employer to the servant is no greater in the one case than in the other, and we can discover no sound reason for the discrimination which declares the danger in the one case may be assumed, and in the other may not. * * * Our study of the subject has led to the conclusion that, in the matter of assumption of risks, it is immaterial whether they arise from the violation of a common-law duty, or an obligation imposed by statute. * * * And it can make no difference whether the statute relates to the condition of the place where the work is to be done, or the method to be pursued in performing it. If the employé, with full knowledge of either, undertakes to accomplish the task assigned at the place or in the method proposed, he ought not to be permitted to complain when conditions and methods were precisely as he knew they would be, and to which he has assented."

The Supreme Court of Massachusetts, in O'Maley v. South Boston Gaslight Co., 158 Mass. 135, 32 N. E. 1119, 47 L. R. A. 161, speaks as follows:

"The doctrine of assumption of risk of his employment by an employé has usually been considered from the point of view of a contract, express or implied; but, as applied to actions of tort or negligence against an employer, it leads up to the broader principle expressed by the maxim, 'Volenti non fit injuria.' One who, knowing and appreciating a danger, voluntarily assumes the risk of it, has no just cause of complaint against another who is primarily responsible for the existence of the danger. As between the two, his voluntary assumption of the risk absolves the other from any particular duty to him in that respect, and leaves each to take such chances as exist in the situation, without a right to claim anything from the other. * * * The statute does not attempt to take away the right of the parties to make such contracts as they choose, which will establish their respective rights and duties. * * * It would be an unwarranted construction of the statute, which would tend to defeat its object. to hold that laborers are no longer permitted to contract to take the risk of working where there are peculiar dangers from the arrangement of the place, and from the kind or quality of the machinery used. Noth-

ing but the plainest expression of intention on the part of the Legislature would warrant giving the statute such an interpretaion."

In Swenson v. Osgood, etc., Mfg. Co., 91 Minn. 509, 98 N. W. 645, decided in 1904, the Supreme Court of Minnesota employed this language:

"Very much stress was laid upon the fact that by the laws of this state (Laws 1893, p. 99, c. 7, § 1) the employer's obligation to properly protect and guard these cogwheels in a practicable manner had been made a statutory duty; but we have held, upon a previous consideration of this statute, that it does not change the general or common-law rule as to contributory negligence or as to the assumption of risks by the employé."

The Court of Appeals of New York, in Knisley v. Pratt, 148 N. Y. 377, 42 N. E. 987, 32 L. R. A. 367, uses the following language:

"In order to sustain the judgment in favor of plaintiff, it is necessary to hold that where the statute imposes a duty upon the employer, the performance of which will afford greater protection to the employé, it is not possible for the latter to waive the protection of the statute under the common-law doctrine of obvious risks. We regard this as a new and startling doctrine, calculated to establish a measure of liability unknown to the common law, and which is contrary to the decisions of Massachusetts and England under similar statutes. * * * We think this proposition is essentially unsound, and proceeds upon theories that cannot be maintained. It is difficult to perceive any difference in the quality and character of a cause of action, whether it has its origin in the ancient principles of the common law, in the formulated rules of modern decisions, or in the declared will of the Legislature. Public policy in such case requires its rigid enforcement, and it was never urged in the common-law action for negligence that the rule requiring the employé to assume the obvious risks of the business was in contravention of that policy. * * * We are of opinion that there is no reason in principle or authority why an employé should not be allowed to assume the obvious risks of the business as well under the factory act as otherwise. There is no rule of public policy which prevents an employé from deciding whether, in view of increased wages, the difficulties of obtaining employment, or other sufficient reasons, it may not be wise and prudent to accept employment subject to the rule of obvious risks. The statute does, indeed, contemplate the protection of a certain class of laborers, but it does not deprive them of their free agency and the right to manage their own affairs."

In Powell v. Ashland, etc., Co., 98 Wis. 35, 41, 73 N. W. 573, 575, the Supreme Court of that state said:

"In such a case it is immaterial that the danger might be guarded against by the employer, even if failure in that respect be a violation of some statutory requirement on the subject. The responsibilities which by the rules of the common law the servant must assume and discharge for his own safety are not affected thereby unless the statute expressly so provides."

The same court, in the case of Helmke v. Thilmany, 107 Wis. 216, 221, 83 N. W. 360, 362, spoke as follows:

"They cite the statute requiring the owner or manager of any factory, workshop, or other place where labor is performed to keep all belting, shafting, gearing, hoists, flywheels, elevators, and drums therein, which are so located as to be dangerous to employés in the discharge of their duty, 'securely guarded or fenced.' Section 1636j, Rev. St. 1898. There is no claim, nor ground for claiming, that such statute precludes the defense of contributory negligence, nor the assumption of risk. Thompson v. Edward P. Allis Co., 89 Wis. 523, 530, 62 N. W. 527. Similar statutes have been construed the same way. Curry v. C. & N. W. R. Co., 43 Wis. 665, 683; Holum v. C., M. & St. P. R. Co., 80 Wis. 299, 50 N. W. 99; Dugan v. C., St. P., M. & O. R. Co., 85 Wis.

614, 55 N. W. 894; Schneider v. C., M. & St. P. R. Co., 99 Wis. 387, 75 N. W. 169."

## Dresser on Employers' Liability, § 82, says:

"When a person engages to work for another, both a contract and a status are created. * * * Although the contract of hiring depends upon the same principles as other contracts, yet it has one peculiarity, in that it creates a status or relationship between the parties to which the policy of the law has affixed certain rights, duties, and disabilities to be observed by each, irrespective of any understanding or supposed agreement between them. These duties and disabilities arise when the relation is created, and continue until it ends, and, for the most part, are determined by the condition of affairs when the contract of hiring is made. It is usual and convenient to treat them as terms of an implied contract, but it is a contract implied from the relationship, and not from the agreement of the parties, and has none of the incidents of a technical contract."

## 2 Labatt on Master and Servant, §§ 649, 650, says:

"The general theory upon which the courts have proceeded is that, in the absence of language evincing a contrary intention on the part of the Legislature, a statute which so far changes the common law as to impose upon a master duties to which he had not been before subject, or to render him liable for the negligence of certain classes of servants, resulting in injury to other servants, whose right of action would, if common-law doctrines were applied, be barred by the rule as to fellow employés, should not be construed in such sense as to preclude the master from availing himself of any of those defenses which, as explained in section 255, ante, are based upon the fact that the injured person adopted a certain course of conduct with a full appreciation, actual or constructive, of the risks from which his injury eventually resulted. * . * * In some instances the statutory provisions which are considered in this and the following chapters operate so as to convert what would be an ordinary risk under the common law into an extraordinary one. But unless this be their effect, they are not deemed to change in any way the rule that a servant assumed all the ordinary risks which are manifestly incident to the employment."

## Endlich, Interpretation of Statutes, § 5, says:

"What is called the 'policy' of the government with reference to any particular legislation is said to be too unstable a foundation for the construction of a statute. The clear language of a statute can be neither restrained nor extended by any consideration of supposed wisdom or policy. So long as a legislative enactment violates no constitutional provision or principle, it must be deemed its own sufficient and conclusive evidence of the justice, propriety, and policy·of its passage. The language of Mr. Justice Story concerning constitutional construction applies almost equally to that of statutes: 'Arguments drawn from impolicy or inconvenience ought here to be of no weight.' The only sound principle is to declare, 'Ita lex, scripta est,' to follow and to obey; nor, if a principle so just could be overlooked, could there be well found a more unsafe guide or practice than mere policy and convenience."

## And in section 7 the author continues:

"In short, when the words admit of but one meaning, a court is not at liberty to speculate on the intention of the Legislature, or to construe an act according to its own notions of what ought to have been enacted. Nothing could be more dangerous than to make such considerations the ground of construing an enactment that is quite complete and unambiguous in itself. 'The moment we depart from the plain words of the statute, according to their ordinary and grammatical meaning, in a hunt for some intention founded on the general policy of the law, we find ourselves involved in a "sea of troubles." Difficulties and contradictions meet us at every turn.' Indeed, to depart from the meaning on account of such views is, in truth, not to construe the act, but

to alter it. But the business of the interpreter is not to improve the statute. It is to expound it."

### Black on Interpretation of Laws, § 4, says:

"The wisdom, policy, or expediency of legislation is a matter with which the courts have nothing whatever to do. Whether or not a given law is the best that could have been enacted on the subject, whether or not it is calculated to accomplish its avowed object, whether or not it accords with what is understood to be the general policy of legislation in the particular jurisdiction, these are questions which do not fall within the province of the courts. And hence a court exceeds its proper office and authority if it attempts, under the guise of construction, to mold the expression of the legislative will into the shape which the court thinks it ought to bear. The sole function of the judiciary is to expound and apply the law. To enact the law is the prerogative of the legislative department of government. Nor can the courts correct what they may deem excesses or omissions in legislation, or relieve against the occasionally harsh operation of statutory provisions, without danger of doing more mischief than good."

It has been confidently claimed that the Supreme Court of Illinois, in certain cases, had decided the rule to be as held by the trial court. But in the late case of Browne v. Siegel Cooper & Co., 191 Ill. 226, 60 N. E. 815, the Supreme Court of Illinois uses this language: ,

"Whether injuries which occur because of the violation by the master of municipal regulations enacted for the preservation of life or limb, should be regarded as lawful and not subject to the defense of contributory negligence, or to the defense of the implied assumption of the servant of the risks and dangers caused by such violation, is a question of public policy for the Legislature, and not one for the courts. We can only apply the law as it is."

The Supreme Court of Illinois by the use of this language does not indicate that it believes that the rule contended for by counsel for Norgate is the correct one. We think the examination of the following cases will show that the weight of authority and the better reasoning is in favor of the views herein expressed: Nottage v. Sawmill Phœnix (C. C.) 133 Fed. 979; St. Louis, etc., Co. v. Miller, 126 Fed. 495, 61 C. C. A. 477, 63 L. R. A. 551; Cleveland, etc., Ry. Co. v. Baker, 91 Fed. 224, 33 C. C. A. 468; Martin v. Chicago St. Ry. Co., 118 Iowa, 148, 91 N. W. 1034, 59 L. R. A. 698, 96 Am. St. Rep. 371; Knisley v. Pratt, 148 N. Y. 372, 42 N. E. 986, 32 L. R. A. 367; O'Maley v. Gaslight Co., 158 Mass. 135, 32 N. E. 1119, 47 L. R. A. 161; Birmingham Elec. Co. v. Allen, 99 Ala. 359, 13 South. 8, 20 L. R. A. 457; Browne v. Siegel, 191 Ill. 226, 60 N. E. 815; Mulhern v. Lehigh Co., 161 Pa. 270, 28 Atl. 1087; Swenson v. Osgood Mfg. Co., 91 Minn. 509, 98 N. W. 645; Williams v. Wagner Co., 110 Wis. 456, 86 N. W. 157; Helmke v. Thilmany, 107 Wis. 216, 83 N. W. 360; Langlois v. Dunn (R. I.) 57 Atl. 910; Victor Coal Co. v. Muir, 20 Colo. 320, 38 Pac. 378, 26 L. R. A. 435, 48 Am. St. Rep. 299; Grand v. Mich. Cent. Ry. Co., 83 Mich. 564, 47 N. W. 837, 11 L. R. A. 402; McGinty v. Waterman (Minn.) 101 N. W. 300; McRickard v. Flint, 114 N. Y. 222, 21 N. E. 153; White v. Wittemann L. Co., 131 N. Y. 631, 30 N. E. 236; Honor v. Albrighton, 93 Pa. 475; Anderson v. Lumber Co., 67 Minn. 79, 69 N. W. 630; Fleming v. St. Paul, etc., R. Co., 27 Minn. 111, 6 N. W. 448; Chicago Pack. Co. v. Rohan, 47 Ill. App. 654; Munn v. Wolff, 94 Ill. App. 122; Keenan v.

Edison Illum. Co., 159 Mass. 379, 34 N. E. 366; Goodridge v. Washington, 160 Mass. 234, 35 N. E. 484; 2 Labatt, Master and Servant, 649, 650; 3 Elliott, R. R. § 1315; 20 Am. & Eng. Enc. of Law (2d Ed.) 127; Dresser, Employers' Liability, §§ 82, 116; Bailey, Master's Liability, p. 480; Duty and Liability of Employers, by Roberts & Wallace, 136, 146, 160, 161, 260; Buswell's Law Personal Injuries, §§ 207–209; Endlich, Interpretation of Statutes, §§ 5, 7; Black on Interpretation of Statutes, pp. 4, 234; Abbott v. McCadden, 81 Wis. 563, 51 N. W. 1079, 29 Am. St. Rep. 910; American Rolling Mill Co. v. Hullinger, 161 Ind. 673, 67 N. E. 986.

We conclude, therefore, that upon reason and authority the trial court erred in not permitting the railroad company to avail itself of the defense of assumption of risk. We think that the trial court also erred in refusing to instruct the jury as requested by counsel for the railroad company upon the question of ordinary care. Counsel for the railroad company requested the court to charge the jury as follows:

"You are further instructed that ordinary or reasonable care, as used throughout these instructions, is such care as a reasonably prudent man would exercise under like circumstances and conditions to those shown in evidence."

The court in its charge used the terms "reasonable care" and "ordinary care," when speaking of the relative duties of the railroad company and Norgate; but the court nowhere defined for the jury what the law means by "reasonable" or "ordinary care" as applied to the case on trial. The issue being tried was one of negligence. To simply say that it was the duty of the railroad company under certain conditions to use ordinary care, and that it was also the duty of the defendant under certain circumstances to also use ordinary or reasonable care, could have been no aid to the jury in determining the question of negligence. The court might as well say to the jury that it was the duty of the railroad company not to be negligent, and it was the duty also of the defendant on his part not to be negligent. The jury would have had as much information to aid them in determining the question at issue if the latter language had been used. The law in cases like the one at bar fixes the standard of duty. This standard remains the same through all the changing conditions and surroundings which may accompany any case of this kind. When the jury know, by being told by the court, what the standard is that the law fixes, then they may determine under all the circumstances and conditions surrounding the case on trial, whether the conduct of either party measured up or fell short of this standard. But with no standard to guide them, they were left so that each juror was at liberty to adopt his own notion of what would be ordinary or reasonable care, under the conditions existing in the case on trial. There might be twelve very careful men in the jury box, or there might be twelve very careless men in the box, or there might be some careful men and some reckless men, and their standards of reasonable or ordinary care would not be the same, or if the same, might be above or below the standard fixed by the law.

We think that when a court is requested in proper language to define "ordinary care," or "reasonable care," it is its duty to do so, because the finding of the jury upon this question in this class of cases determines whether either party has been guilty of negligence or not. It is claimed on the part of counsel for Norgate that there was no error in the refusal to give the instruction asked, for the reason that the railroad company was negligent in any event, by failing to block the frogs and guard rails in the yard at Pueblo, and that the instruction upon ordinary care, or reasonable care, could only have applied to the alleged contributory negligence of Norgate, and that the evidence showed beyond question that he was not negligent. We are not called upon to determine all the questions in this case, both of fact and law. There were other issues submitted to the jury besides the negligence of the company in failing to block the frogs and guard rails. The court submitted to the jury the question as to the negligence of the company in regard to the coupler on the freight car. We simply hold that where an issue of ordinary care or reasonable care is submitted to the jury for their determination, the court ought, when requested, to tell the jury what is meant by those terms.

It is, of course, urged that the question of reasonable care and ordinary care is always one for the jury, and it was for them to say whether the parties used ordinary care or reasonable care, but the jury cannot certainly pass intelligently upon the issue of negligence, without they are informed as to what constitutes negligence. To tell the jury that negligence was the want of ordinary care under certain conditions does not help them to determine the question, without they are further informed as to what is meant by ordinary care.

We are clearly of the opinion that for the error in not allowing the railroad company to urge the assumption of risk in defense of the action of Norgate, and also for the error in not defining ordinary and reasonable care, as requested by counsel for the railroad company, the judgment of the trial court must be reversed, and a new trial granted; and it is so ordered.