[No. 1810, February 21, 1916.]
## MELKUSCH v. VICTOR AMERICAN FUEL CO.

### SYLLABUS OF THE COURT.

1. A miner employed in a coal mine does not assume the risk of injury from the master's violation of a statutory duty to provide an ample supply of timbers and to cause the same to be delivered on the pit car, at the request of the miners, as near as practicable to the place where the same are to be used, as required by paragraph 11, subsec. 64, § 3507, Code 1915.

P. 401

2. Paragraph 6, subsec. 65, § 3508, Code 1915, which makes it a penal offense for any coal miner to work or remain in any unsafe or dangerous place in a coal mine, knowing the same to be such, except for the purpose of remedying such

Melkusch v. Victor American Fuel Co., 21 N. M. 396.

condition, construed. **Held,** that this section does not prohibit a miner from remaining or working in a room where a portion of the roof requires timbers and supports, in order to render it safe, so long as the place where he is working is a safe place, and does not require timbers or supports; that, under this section, he is not guilty so long as he remains from beneath the particular portion of the roof which is unsafe and dangerous.

P. 404

3. Contributory negligence being an affirmative defense, the burden of establishing it rests upon the defendant.

P. 406.

4. Evidence reviewed. **Held** that, under the plaintiff's evidence, he was entitled to go to the jury upon the question as to whether he was working in a dangerous or unsafe place, knowing the same to be such.

P. 406

5. Where men of reasonable minds might draw different conclusions from the evidence, the case is for the jury, and this is so although the evidence is uncontradicted.

P. 409

6. A servant who is suddenly exposed to great and imminent danger is not expected to act with that degree of prudence which would otherwise be obligatory.

P. 410

Appeal from District Court, McKinley County; H. F. Raynolds, Judge.

Action by Matt Melkusch against the Victor American Fuel Company. From a judgment for defendant, plaintiff appeals. Reversed, with directions to award new trial.

A. T. HANNETT of Gallup and GEORGE S. KLOCK of Albuquerque, for appellant.

Servant did not assume the risk on account of breach by master of duty imposed upon him by statute.

C. 80, Laws 1912; sec. 2343, C. L. 1897; Narramore v. Cleveland C. C. & St. L. R. R. Co., 96 Fed. 298; Fitzwater v. Warren, 42 L. R. A. (N. S.) (N. Y.) 1229; Welch v. The Waterbury Co., 206 N. Y. 522; 5 Labatt's Mas. & Ser. 5061; Johnson v. Mammoth Vein Coal Co., 19 L. R. A. (N. S.) 646; Low v. Clear Creek C. Co., 33 L. R. A. (N. S.) 656; 3 Labatt's Mas. & Ser. 1208; Cheek v. Mo., K. & T. Ry. Co., 131 Pac. 624; Le Roy v. Mo., K. C T. Ry. Co., 138 Pac. 646; Drugalis v. Northwestern Imp. Co., 83 Pac. 101; Green v. Western Amer. Co., 70 Pac. 315; Davis v. Polland, 62 N. E. 492.

As to when case is for jury, see:

Labatt Mas. & Ser., p. 4988; Abb. Civ. Jury Trials, 606; Left Fork Coal Co. v. Owens, 159 S. W. 703; Fuson v. New Bell Jellico Coal Co., 159 S. W. 619; Collins v. Anth. Coal Co., 88 Atl. 75; Deserant v. Cerrillos Coal & Ry. Co., 178 U. S. 409.

R. E. TWITCHELL of Santa Fe and CALDWELL YEAMAN of Denver, Colo., for appellee.

Evidence insufficient in degree to permit case to go to jury.

8 Enc. Ev. 852; Hart v. Hudson Bridge Co., 84 N. Y. 56; Jones v. N. C. Ry. Co., 67 N. C. 122.

Injury was caused by appellant's own negligence, hence he cannot recover from appellee.

White Per. Inj. in Mines, sec. 136, and cases cited.

As a matter of law appellant assumed the risk.

O'Neal v. Ry. Co., 9 Fed. 337; Woodworth v. Railway Co., 18 Fed. 282; D. & R. G. Ry. Co. v. Nargate, 141 Fed. 247; Bailey's Master's Liability, Injuries to Servants, p. 151, p. 22; Paul v. Florence Mining Co., 50 N. W. Rep. 189; Allridge v. Furnace Co., 78 Mo. 559; Curley v. Huff,

Melkusch v. Victor American Fuel Co., 21 N. M. 396.

5 Am. Neg. Rep. 668; Syndicate v. Murphy, 60 S. W. Rep. 182; Quimm v. Baird, 7 Am. Neg. Rep. 712; St. Louis, etc., R. Co. v. Irwin, 37 Kans. 701, 16 Pac. 146; Melzer v. Peninsular Car Co., 76 Mich. 94, 42 N. W. 1078; Fisher v. Chicago, etc., R. Co., 77 Mich. 546, 43 N. W. 926; Williams v. Delaware, etc., R. Co., 116 N. Y. 628, 22 N. E. 1117, 42 Am. & Eng. R. Cas. 254; Bailey v. Rome, etc., Co., 49 Hun. 377, 19 N. Y. S. R. 656; Spencer v. N. Y., etc., R. Co., 51 N. Y. S. R. 386, 67 Hun. 196; Johnson v. Oregon, etc., R. Co., 23 Oregon, 94, 31 Pac. Rep. 283; Sweeney v. Central Pac. R. Co., 57 Calif. 15, 8 Am. & Eng. R. Cas. 151; Doyle v. St. Paul R. Co., 42 Minn. 79, 43 N. W. Rep. 787, 41 Am. & Eng. R. Cases, 376; Drake v. Union Pac. R. Co., 2 Idaho, 453, 21 Pac. Rep. 560; Louisville, etc., R. Co. v. Hanning, 131 Ind. 528, 31 N. E. 187, 53 Am. & Eng. R. Cas. 452; Michigan, etc., R. Co. v. Smithson, 45 Mich. 212, 7 N. W. 791, 1 Am. & Eng. 101; Gaffney v. New York, etc., R. Co., 15 R. I. 456, 7 Atlantic, 284, 31 Am. & Eng. R. Cas. 265; Latremouille v. Bennington, etc., R. Co., 63 Vt. 336, 22 Atl. 656, 48 Am. & Eng. R. Cas. 265; Gibson v. Erie R. Co., 63 N. Y. 449, 20 Am. Rep. 552; Priestly v. Fowler, 3 Mees & W.

For distinction between assumption of risk and contributory negligence, see:

Schelmmer v. Buffalo, etc., Ry. Co., 220 U. S. 591; Narrowmore v. Cleveland, etc., R. Co., 37 C. C. A. 499; Texas Pac. Ry. Co. v. Archabald, 170 U. S. 665; Dist. Columbia v. McEiligott, 117 U. S. 621; Anderson v. Smith, 35 App. Cas. (D. C.) 93; Maki v. U. P. Coal Co., 187 Fed. 391; Mining Co. v. Bateman, 176 Fed. 57; Seaboard Air Line Co. v. Horton, 34 Sup. Ct. Rep. 635.

As to power to direct a verdict, see:
Gunn v. Union R. Co., 62 Atl. 120.

## STATEMENT OF FACTS.

The complaint in this cause alleged that the plaintiff below, who is appellant here, was on the 26th day of April, 1913, engaged in the service of the defendant as a

coal miner; that it was the duty of the defendant to furnish plaintiff with a safe and suitable place in which to perform his work, and to provide him with safe and suitable tools, props, and equipment with which to perform such services; that plaintiff requested timber to be used for the purpose of properly supporting the roof of the room in the mine of the defendant company, where plaintiff was employed as a miner, for a period of two or three days prior to the accident; and that the defendant and its employes failed and neglected to supply plaintiff with the timber requested, or with any timber for the support of the roof; and that by reason of this neglect the plaintiff was injured; and that the roof of said room fell because of the failure and neglect of the defendant and its officers, servants, and agents to supply timber. The accident occurred on the 26th day of April, and was a result, as alleged by plaintiff, of a fall of a portion of the roof of the room where he was engaged in the service of the defendant at the time, which resulted in the crushing of the right arm of the plaintiff, necessitating its amputation. The defendant below by way of answer, after denying the essential facts upon which its negligence is predicated, pleaded assumption of risk by the plaintiff, contributory negligence, and the fellow-servant doctrine. Reply denying the new matters pleaded in the answer was filed by the plaintiff, and the cause proceeded to trial. After both parties had introduced all their evidence, the defendant moved for an instructed verdict, setting forth in its motion fifteen grounds upon which it relied for the relief sought. Only three of these grounds need be stated, as the remainder were either without merit or were obviated by an amendment to the complaint which upon motion the plaintiff was allowed to make. They were as follows:

"First. The complaint filed herein does not state facts sufficient to constitute a cause of action.

"Second (Sixth). The plaintiff (complaint) in this case and the testimony on behalf of the plaintiff, supplemented by the testimony introduced on behalf of the defendant, discloses as a matter of law that plaintiff assumed the risk of the accident which befell him at the time and place mentioned in the complaint.

Melkusch v. Victor American Fuel Co., 21 N. M. 396.

"Third (Twelfth). It appears from the testimony in this case that plaintiff was guilty of a positive and distinct violation of the statutes of this state in failing to take down or prop the roof of coal and caused the injury complained of."

The motion was sustained, apparently upon the theory that the evidence disclosed that plaintiff was guilty of the violation of a statute, and that such violation of law contributed proximately to his injuries. The statute in question will be found quoted in the opinion. From a judgment dismissing the complaint on the merits, this appeal is prosecuted.

## OPINION OF THE COURT.

ROBERTS, C. J. (after stating the facts as above.)—
[1] Under the facts in this case as disclosed by the record, the paramount question presented is whether the appellant assumed the risk incident to the appellee's violation of the statute, which required it to "provide an ample supply of timbers and to cause the same to be delivered on the pit car, at the request of the miners, as near as practicable to the place where the same are to be used" (paragraph 11, sub-sec. 64, § 3507, Code 1915), failure to comply with which is made a penal offense by sub-section 20 of the same section. Upon the question as to whether there had been a failure to furnish such timbers and props there was a direct conflict in the evidence; hence, if appellant did not assume the risk, he was entitled to go to the jury upon this question.

The English and American decisions dealing with the question will be found collected in the notes to the following cases reported in L. R. A. Reports: O'Maley v. South Boston Gaslight Co., 47 L. R. A. 161, subd. "h," p. 190; Denver & Rio Grande R. R. Co. v. Norgate, 6 L. R. A. (N. S.) 981; Johnson v. Mammoth Vein Coal Co., 19 L. R. A. (N. S.) 646; Hill v. Saugestad, 22 L. R. A. (N. S.) 634; Poli v. Numa Block Coal Co., 33 L. R. A. (N. S.) 646; Fitzwater v. Warren, 42 L. R. A. (N. S.) 1229; Curtis & Gartside Co. v. Pribyl, 49 L. R. A. (N. S.) 471. From cases collected in the above notes it will be seen that there is an irreconcilable conflict in the authorities, both

federal and state, on the question. The case of D. & R. G. R. R. Co. v. Norgate, supra, 141 Fed. 247, 72 C. C. A. 365, 6 L. R. A. (N. S.) 981, 5 Ann. Cas. 448, is regarded generally as the leading American case holding that the servant assumes the risk, while the case of Narramore v. Cleveland, C., C. & St. L. Ry. Co., 96 Fed. 298, 37 C. C. A. 499, 48 L. R. A. 68, is the leading case holding to the contrary. Both sides of the question have been so often and so ably stated and presented by eminent judges that it is hardly possible to add anything to the argument on either side. It is noteworthy that the modern trend of authority is in favor of the rule that the servant does not assume the risk. The reason for this holding is so well stated by the Illinois Supreme Court in the case of Streeter v. Western Wheeled Scraper Co., 254 Ill. 244, 98 N. E. 541, 41 L. R. A. (N. S.) 628, Ann. Cas. 1913C, 204, that we quote from it at length.

"The passage of a law like that now under consideration implies that the class of employes for whose protection it was intended had not been able to protect themselves without it. Its object, as indicated by the title of the act, is to provide for the health, safety, and comfort of employes in factories, mercantile establishments, mills, and workshops in this state, and the authority for it is found in the police power of the state. The effect of it is to create a new situation in the relation of master and servant, and to present the new question whether the doctrine of assumption of risk heretofore applied to that relation should apply in the same way to the new conditions. The duty of the master has been changed. He may no longer conduct his business in his own way. He may no longer use such machinery and appliances as he chooses. The measure of his duty is no longer reasonable care to furnish a safe place and safe machinery and tools, but, in addition to such reasonable care, he must use in his business the means and methods required by the statute. The law does not leave to his judgment the reasonableness of inclosing or protecting dangerous machinery, or permit him to expose to increased and unlawful dangers such of his employes as may be driven by force of circumstances to continue in his employ rather than leave it and take chances on securing employment elsewhere under lawful conditions. The guarding of the machinery mentioned in the statute is a duty required of the master for the protection of his workmen, and he owes the specific duty to each person in his employ. To omit it is a misdemeanor subjecting him to a criminal prosecution. The necessity for such legislation is suggested by a consideration of a sentence from the opinion

Melkusch v. Victor American Fuel Co., 21 N. M. 396.

in the Knisley Case [148 N. Y. 372, 42 N. E. 986, 32 L. R. A. 367], which says: 'There is no rule of public policy which prevents an employe from deciding whether, in view of increased wages, the difficulties of obtaining employment, or other sufficient reasons, it may not be wise and prudent to accept employment subject to the rule of obvious risks.' Notwithstanding the theoretical liberty of every person to contract for his labor or services and his legal right to abandon his employment if the conditions of service are not satisfactory, practically, by stress of circumstances, poverty, the dependence of his family, scarcity of employment, competition, or other conditions, the laborer frequently has no choice but to accept employment upon such terms and under such conditions as are offered. Under such circumstances experience has shown, before the passage of the statute, that many employers would not exercise a proper degree of care for the safety of their workmen. The servant had to assume the risk of injury, and the master took the chance of a suit for damages. It was to meet this precise situation and protect employes in such situation that this legislation was adopted. It imposes upon the master an absolute, specific duty, one which he cannot delegate, and against his neglect of which he ought not to be allowed to contract. If the employe must assume the risk of the employer's violation of the statute, the act is a delusion so far as the protection of the former is concerned. He is in the same condition as before it was passed. He is compelled to accept the employment. He must assume the risk. When he is killed or crippled, he and those dependent on him have no remedy, and the law is satisfied by the payment of a fine. The more completely the master has neglected the duty imposed upon him by statute for the servant's protection the more complete is his defense for the injury caused by that neglect. Justice requires that the master, and not the servant, should assume the risk of the master's violation of the law enacted for the servant's protection, and, in our opinion, this view is in accordance with sound principles of law."

This statement of the law accords with our views, and such we believe to have been the intention of the lawmakers in the enactment of this statute. By the Constitution of the state (section 2, art. 17), the Legislature was directed to enact laws which should provide for the adoption and use of appliances necessary to protect the health, and secure the safety of employes therein. Evidently chapter 80, Laws 1912, was the result of an attempt on the part of the lawmaking power to comply with this mandate of the Constitution. To hold that the lawmaking power intended to do nothing more than to repeat in statutory form a duty which was already imposed upon the opera-

tor by the common law would convict it of doing a vain and useless thing—of enacting a law which was but "a delusion and a snare."

[2] Two other questions remain for consideration, the primary one being the proper construction of paragraph 6 of sub-section 65 of section 3508, Code 1915, and the secondary question being one of fact.

First as to the statute, which reads as follows:

"It shall be the duty of every coal miner to take down all dangerous coal, slate, rock or other material in his working place, or to make the same safe by proper timbering. It shall be unlawful for any coal miner to work or remain in any unsafe or dangerous place in a coal mine, knowing the same to be such, except for the purpose of remedying such condition, or for any owner or operator to require him to do so."

Appellant was working in a room which was probably 75 or 80 feet in length and from 20 to 30 feet in width. There is no dispute but that this room was properly and securely timbered, except portions of it near the face or breast of the coal at the extreme rear of the room. Was appellant violating the statute by remaining in the room and working near the breast of the coal, at a place where the roof was apparently safe and did not require mine props and timbers to render it safe? If the statute prohibits a miner from remaining in a room where a portion of the roof within such room requires props and timbers in order to render that particular portion of the room safe, then the trial court was clearly right in directing a verdict; for it is well settled that one whose injuries are the proximate result of his violation of a statute is, as a matter of law, guilty of contributory negligence which precludes a recovery for the negligence of another which contributed to the injury. Riley v. Pittston Coal Mining Co., 224 Pa. 633, 73 Atl. 944; Young v. Chicago, M. & St. P. R. Co., 100 Iowa, 357, 69 N. W. 682; 1 Thompson on Negligence, § 204; 3 Labatt, Master and Servant, § 1278.

All coal mines are more or less dangerous, and, notwithstanding that due and proper precautions have been

Melkusch v. Victor American Fuel Co., 21 N. M. 396.

taken to prop and secure the roof from falling, there is always more or less likelihood of portions of the roof falling upon and injuring those who may be, in such mines. This, of course, is an ordinary risk of the business which cannot be obviated. It is nevertheless a danger always, present, and which the ingenuity of man cannot obviate without incurring an unwarranted expense.

That it was not the intention of the Legislature to make it a misdemeanor for a miner to remain or work in a mine because of these ordinary dangers goes without saying. What the lawmaking power was trying to prohibit was the heedless recklessness of some miners in knowingly working under a roof which required timbering in order to make it safe, or, more strictly speaking, to make it as safe as it could be made by the use of such timbers. To say that this section of the statute prohibits a miner from working in one portion of a room, because some other portion of the roof in such a room might require timbering would, if carried to its logical conclusion, prohibit a miner from working in any portion of a mine where some other portion of the mine required props and timbers in order to prevent the roof from falling. All we believe the statute was designed to prevent and punish was one knowingly working under a defective roof which required timbers and props in order to make it safe, and in order to violate this statute the miner must be engaged at work or remain under that portion of the roof which he knows is defective and unsafe. For illustration, let us suppose that in the northeast portion of this room, which we will suppose was 25 by 80 feet, there was a small spot in the roof 3 by 6 feet that required props and timbers in order to render it safe, but that all the remaining portions of the room were securely timbered and were safe. Could it be argued with any propriety that a miner would be violating this statute so long as he remained from underneath this spot in the northeast corner 3 by 6 feet, where he knew the roof was defective and dangerous? We think not. So long as he did not work or remain beneath the particular portion of the roof which required timber-

ing it could not be said that he was working or remaining in "any unsafe or dangerous place."

The court instructed the jury to return a verdict for the defendant upon the assumption that the evidence disclosed that appellant was working in a dangerous place in violation of the terms of the above statute, and that his violation of the statute was the proximate cause of his injuries. Whether this instrurtion was warranted depends, of course, upon the facts in evidence, and in considering the facts established it must be borne in mind that the burden rested upon the defendant to show that appellant violated this statute, and that such violation contributed proximately to his injuries.

"The great weight of authority as well as the reason of the law, is in favor of the rule which imposes the burden of proof upon defendant to establish plaintiff's contributory negligence. * * * When a plaintiff has left his cause in a condition which would justify the judge in declaring in the charge that the evidence prima facie shows contributory negligence, there is nothing to submit to the jury. But when his evidence is such that the court cannot so determine, its effect, as a matter of law, the question whether or not he affirmatively appears to have been guilty of negligence is to be submitted to the jury, on all of the facts adduced, and is not to be divided up by instructing that some of the facts, unless rebutted or explained, would constitute such negligence, and then leaving the jury to say whether or not such facts have been rebutted or explained." Jones on Evidence, § 185.

[3] Contributory negligence being an affirmative defense, the burden of establishing it rested upon the defendant.

[4] The evidence offered on behalf of the defendant tended to establish two propositions: First, that the fall of the rock or coal which injured plaintiff came from the face of the coal, and not from the roof; and, second, that defendant had furnished plaintiff with props, and that defendant had failed to place the same in position. Witnesses for the defendant testified that immediately after plaintiff was injured they found unused props in ample number to have fully supported the roof which plaintiff had not used. Now, if either proposition advanced by

defendant's witnesses was true, plaintiff could not recover. On the other hand, both these facts were flatly contradicted by the plaintiff and other witnesses which he produced. This, of course, became a question of fact for the jury to determine.

Appellee claims, however, that appellant's own evidence discloses that he was violating the above statute, and that such evidence fully warranted the instructed verdict. The brief filed by appellee contains the following excerpt taken from the evidence given by appellant, which, we assume, is regarded as the strongest part thereof tending to support its theory of the case.

"A. Yes, sir; it was a bad top, and we had to do it. .Q. You. knew the roof was bad in the room, did you, Mr. Melkusch? A. Yes; I knew that, for the reason I had to timber it. Q. You made a daily personal examination to look into the character of the roof as you proceeded with your work, did you not? A. Yes; I had to do that myself, because nobody would come in there to show that to me. Q. There was nobody knew the condition of that roof as well as you did yourself; isn't that so? A. Yes; nobody could know it any better than I, because I worked in it. Q. And if there was any overhanging slate or any substance whatever constituting either a part of the roof or a part of the seam of coal that was overhanging, the safe way to take that down would be to stand up and take your pick and pick it down, would it not? A. The safest would be this: If you have enough timber in a place when you have a bad roof, you would put your props first; then take down the coal. Q. And, if you didn't have any timber, it would be absolutely unsafe to go underneath that overhanging coal or slate, would it not? A. I wouldn't go there. Q. And all this time you knew the roof was in bad shape, did you? A. Yes, sir; the whole place was the same roof."

This evidence, standing alone and disconnected from the other facts testified to by appellant, would seemingly support this view, but, when considered as a whole, it does not do so. Plats or maps of the room in which appellant was working were offered in evidence by both parties. From each it appears that all portions of the roof in the room were amply secured by props, except possibly near the face of the coal against which appellant was working, which was approximately 20 or 25 feet in width. Nor does it appear that all of the roof near the face of the

coal required props and timbers in order to make it safe; for appellant testified that the day before he was injured he secured a prop from another room and set it up under the roof, near the face of the coal, a little to the right of the center of the room. From this fact a reasonable mind might draw the inference that this secured the roof at this point and rendered it reasonably safe. The witness had testified that the roof in all parts of the mine was what was known as bad roof; that is, that it all required timbering in order to render it reasonably safe.

Appellee assumed that, because appellant testified, as above shown, that he knew the roof was in bad shape, that he established the fact by his own admission that he was working in a dangerous place, within the meaning of the statute. What the witness intended to say was that the whole mine had a bad roof, that he was fully aware of this fact, that it all required timbering; but we do not think he intended to say that all the roof, supported as it was by timbers and props, was dangerous and unsafe beyond the ordinary risks incident to all such roofs. The accident happened on the 26th day of April, 1913. The witness testified that on the 25th day of that month he got a prop from one of the other rooms, because his request that he be supplied with props had not been complied with, and set it on the right-hand side of the center of the room, about 4 feet from the breast of the coal. Asked by counsel for appellee as to why he set it there, rather than under the roof over the railway track, or, in other words, the particular portion of the roof that fell, the witness answered that he could not prop up the roof over the place where the track would run, because it required a cross-arm. In other words, the track ran along the left-hand side of the room, and the roof over this track was supported by means of cross-timbers, one end of which was inserted in the coal on the left-hand side, and the other was supported by an upright on the other end, leaving the track space clear. If the witness' testimony was true, he had made repeated demands for props upon three separate days prior to the accident which had

not been complied with. He stated that on the 26th he knew the roof was bad; that he selected a spot near the center of the room (which apparently was under the portion of the roof supported by the prop which he had put in the day before) and began drilling a hole for the purpose of putting in a "shot." On cross-examination the witness was asked the following question:

"And you wouldn't consider a man a good coal digger who would deliberately go under a piece of roof of that kind and begin picking against the face with a pick?"

To which the witness replied:

"Nobody would go under it if he knew that it was in bad condition, and I wasn't under it either when it caved in on me. I was working at the breast, and was trying to get away from it."

This item of evidence and others all tend to show that appellant regarded the portion of the roof which fell, which was on the left-hand side of the room, in front of the end of the track, and covered a space of about 3 by 6 feet, as dangerous, and that it was for this portion of the roof that he was in need of props; that he was careful to remain from under this portion of the roof, and went over near the center of the room, in front of the prop he had set the day before and was drilling the hole, while awaiting the arrival of the props he had ordered. The evidence upon this point, it must be conceded, is not altogether clear and satisfactory, but, bearing in mind that the burden upon this phase of the case was upon the defendant, we do not think that it established the fact, as the trial court must have determined, that the plaintiff was working in a dangerous place, within the meaning of the statute, and his being in such place contributed proximately to his injury.

[5] "Where men of reasonable minds might draw different conclusions from the evidence, the case is for the jury, and this is so although the evidence is uncontradicted." 38 Cyc. 1539.

[6] The evidence in this case comes clearly within the rule stated, unless it is true that appellant was guilty of negligence in stepping backward when he heard the roof crack and some loose stone fell upon his feet. He was working near the center of the room, or possibly at a point a little to the right of the room. The roof fell near the left of the room, about 6 feet from where he was working. If his evidence be true, the company was negligent in not furnishing him with props so that he could have secured this roof. While he was at work on his knees drilling the hole, he heard the roof crack, felt some loose stone fall upon his feet and legs, sprang up, took two steps backward toward the left of the room, and was crushed by the stone that fell from the roof, which, as stated, was about 3 by 6 feet. In the situation in which he found himself, when he heard the roof crack and felt the stones fall upon his feet and legs, he was confronted by a serious danger, and did not have time to deliberate upon what course of action would be most conducive to. his safety. In other words, he acted, as was natural, upon the first impulse which came to him, which was to step backward. Upon this question the rule is thus stated in Labatt's Master and Servant, § 1274:

"In other cases the essence of the situation to be considered is that the servant was confronted by a serious danger; that he had not sufficient time to deliberate upon the comparative safety to the alternative courses of action open to him for the purpose of avoiding injury; and that the alarm or nervous excitement produced by the conjecture impaired his reasoning faculties to such a degree that it was unjust to gauge the quality of his conduct by the ordinary standards. It is well settled that a servant who is suddenly exposed to great and imminent danger is not expected to act with that degree of prudence which would otherwise be obligatory; or, as the doctrine is also expressed, a servant is not necessarily chargeable with negligence because he failed to select the best means of escape in an emergency."

The text is abundantly supported by the authorities, and, indeed, the rule is so clearly fair and just and so fully in accordance with the known instincts of mankind. that no argument is required to support it. This being true, we have the following situation presented, according

to appellant's testimony: In the room in which he was at work there is a portion of the roof near the left-hand side that requires timbers and supports in order to render it safe. This he cannot timber, because the company has not complied with its statutory duty to keep him supplied with material. Knowing this portion of the roof to be dangerous, he avoids it and goes over near the center of the room and works. While working there, he hears the roof crack, and knows that it is going to fall some place. In his excitement, and upon a sudden impulse, and prompted by that human instinct which tells him that his life is in danger, he springs directly under this roof, which falls because the company has not complied with its duty to furnish timbers and supports, and is injured. Under these facts clearly he had a right to have the case go to the jury, and the trial court erred in instructing a verdict for the defendant.

For the reasons stated, the case should be reversed, with directions to the trial court to award appellant a new trial; and it is so ordered.

HANNA and PARKER, J.J., concur.